FRANK A. KLITCH, AN INFANT, BY GEORGE KLITCH, HIS NEXT FRIEND, PLAINTIFF-RESPONDENT, v. EDWIN BETTS, DEFENDANT-APPELLANT.

Submitted March 27, 1916—Decided June 19, 1916.

1. For all acts done by a servant in obedience to the express orders or direction of the master, or in the execution of the master's business, within the scope of his employment, and for acts in any sense warranted by the express or implied authority conferred upon him, considering the nature of the service required, the instructions given and the circumstances under which the act is done, the master is responsible.

2. Where a servant is acting within the scope of his employment, and by his negligence causes injury to a third party, the master will be responsible, although the servant's act was contrary to his master's orders.

3. This court will not consider the question of excessive damages on appeal from a judgment at law; judgments of the inferior law courts are reviewed by this court upon matters of law only.

On appeal from the Essex Circuit Court.

For the appellant, *King & Vogt.*

For the respondent, *William Hauser.*

The opinion of the court was delivered by

WILLIAMS, J. This is an appeal from a judgment recovered by Frank A. Klitch, an infant, by his next friend, against Edwin Betts, in the Essex Circuit Court, March 16th, 1915.

The plaintiff, ten years of age, was brought by his father to defendant's dental office on January 20th, 1914, at eight P. M. to have a tooth extracted. A Dr. Snively was in the employ of defendant at the time as an assistant, and his office hours were from nine A. M. to six P. M. In the absence of defendant, Dr. Snively extracted a deciduous molar tooth from plaintiff's lower left jaw, for which he was paid fifty cents. The plaintiff suffered no ache or pain after the extraction

until January 29th, 1914, when he again went to defendant's office with his father, about eight P. M., and in the absence of defendant, Dr. Snively extracted a molar tooth next to the one he extracted January 20th, and was again paid for his services. The plaintiff had not complained of toothache until that day. Immediately after this extraction he underwent great suffering, and complained of great pain; he did not sleep that night, cried through the night and continued in great pain. On January 31st (Sunday), he again went to defendant's office with his mother, and Dr. Snively treated the injured jaw; on February 1st, he again went to defendant's office when, for the first time, defendant examined him; he also went the next day, and two days later defendant told plaintiff's mother that he thought an operation would be necessary. On the latter occasion defendant extracted a tooth, but Dr. Snively was not present; two days later defendant again examined plaintiff and again advised his mother that an operation would be necessary, but that he could not perform it. He was taken to Dr. Povey, who gave him a salve and mouth wash and attended him until February 16th, during which time plaintiff's mother also saw defendant, and it was finally decided that an operation should be performed; he was then examined by a Dr. Sherman, who treated the jaw by making an incision in it; he also advised an operation. On February 22d, Dr. Epstein examined the plaintiff and he was taken to the doctor's private hospital to be operated upon. Dr. Epstein performed the operation of scraping the bone for a condition of necrosis, which Dr. Betts, himself, says he thought was present. When this operation was performed by Dr. Epstein he says that he discovered that the boy's jaw was fractured; previous to that time he says he found *crepitus,* or the sound of scraping of one fragment of bone against another. It was found necessary to remove one-half to three-quarters of an inch of the jaw bone, as a result of which plaintiff's face is disfigured and the affected side is not as strong as the opposite. Defendant was informed of these operations in the presence of Snively. It was also testified that if in a case like the one at bar a fracture resulted from pulling the tooth, the

operator had not exercised reasonable care. Dr. Snively testified that the tooth was a deciduous, or baby tooth, which is expelled by the permanent teeth, and that he could have dug it out with his fingers; that it had no roots; that the roots had been absorbed by natural processes, and by the growth of the permanent tooth. He, however, used a forceps, and when the father remarked, "Why, that came out very easily," he replied, "It did not come out as easy as you think it did," but he states that he made this remark because he thought the father would not want to pay him if it came out so easy.

The plaintiff rested his case on the alleged negligence of Dr. Snively in drawing the tooth, causing a fracture of the jaw bone from which necrosis resulted, and on the contention that the relation of master and servant existed between the defendant and Dr. Snively at the time of the performance of the alleged negligent act.

Motion for nonsuit was made and also a motion to direct the verdict for the defendant at the conclusion of the testimony, both of which were denied by the court, from which refusal this appeal is taken.

The defendant assigned the following errors for reversal of the verdict and judgment thereon:

(1) The court erroneously refused to grant defendant's motion for a nonsuit, on the ground that the existence of the relation of master and servant between defendant and Dr. Snively at the time of the extraction of the tooth by Dr. Snively on January 29th, 1914, was not proved.

(2) The court improperly refused to grant defendant's motion for a nonsuit, on the ground that under the proof it was impossible to ascertain the damages to be attributed to negligence, if any, on the part of Dr. Snively.

(3) The damages awarded were excessive.

(4) The court erroneously and improperly refused to grant a motion for the direction of a verdict in favor of the defendant, on the ground that there was no proof that the fracture resulted from any act on the part of Dr. Snively.

As to the first assignment of error there was evidence when plaintiff rested his case that Snively was the employe of the

defendant, having worked for him for about two years, and was being paid wages by the defendant at the time of the injury sustained by the plaintiff. It nowhere appears that Snively was acting on his own account, or that he had permission to use defendant's office conveniences and appliances to carry on his own business, either after these hours, or otherwise, or that his name appeared on any sign or display card. The claim that the relationship of master and servant did not exist was based upon the fact that Snively's hours in the defendant's office were from nine A. M. to six P. M., and that he was not authorized to extract teeth except under the supervision of the defendant, the contention being that because the tooth was extracted after six o'clock, and in the absence of the defendant, it was the independent act of Snively, and not done in the course of his employment. What Snively did was within his implied authority, and even if done without the authority of the defendant, for any violation of general rules laid down for Snively's guidance the master is still responsible. When the defendant employed Snively and left him in charge of his office so that persons going there had a right to infer that he represented the defendant, the mere fact that it was after six o'clock did not destroy the relation of master and servant.

The general rule is a very clear one, that the master is liable for any act of his servant done within the scope of his employment, and if a servant is acting in the execution of his master's orders, and by his negligence causes injury to a third party, the master will be responsible, although the servant's act was not necessary for the proper performance of his duty to his master or was even contrary to his master's orders. *McCann* v. *Consolidated Traction Co.*, 59 *N. J. L.* 481, 487.

The application of the rule *respondeat superior* does not depend upon the obedience of the servant to his master's orders, nor upon the legality of the servant's conduct; where a servant is acting within the scope of his employment, and in so acting does something negligent or wrongful, the employer is liable, even though the acts done may be the very

reverse of that which the servant was actually directed to do. *Driscoll* v. *Carlin,* 50 *N. J. L.* 28, 30.

In *Holler* v. *Ross,* 68 *N. J. L.* 324, it was held that the servant of the master cannot bind the master to respond in damages to the plaintiff unless it be shown that the act which the servant did, which caused the injury, was an act which was, expressly or by necessary implication, within the line of his duty under his employment, and it cites with approval *Stone* v. *Hill,* 45 *Conn.* 44.

"For all acts done by a servant in obedience to the express orders or direction of the master, or in the execution of the master's business, within the scope of his employment, and for acts in any sense warranted by the express or implied authority conferred upon him, considering the nature of the service required, the instructions given and the circumstances under which the act is done, the master is responsible; for acts which are not within these conditions, the servant alone is responsible."

To rebut the presumption of liability of a master for damage consequent upon the negligent act of a servant, done within the apparent scope of the latter's employment, it must be shown either that the act was purely wanton or that it was not performed in furtherance of any duty within the actual scope of the servant's authority. *Rhinesmith* v. *Erie Railroad Co.,* 76 *N. J. L.* 783.

In cases where the scope of authority of a servant or agent depends upon disputed matters of fact, the extent of such authority is ordinarily a question for the jury. *Dierkes* v. *Hauxhurst Land Co.,* 80 *N. J. L.* 369.

There was also evidence of ratification in defendant's treatment of the plaintiff a few days after the extraction, and continuing to treat him and advising an operation. The father testified that he paid Dr. Snively on both occasions, when teeth were extracted, and when defendant was asked if he received the money which was paid to Dr. Snively, he said, "I don't remember." Being asked again, "You don't know?" he answered, "No, sir."

If, after denial of a motion for nonsuit, for failure of proof, the defect was supplied in the evidence afterwards adduced, the error of refusal will not lead to a reversal. *Esler* v. *Camden, &c., Railway Co.,* 71 *N. J. L.* 180.

As to the second assignment of error there was abundant proof from which the jury might find that the necrosis resulted from the negligent manner in which Snively treated the plaintiff. That disease, according to the testimony, may result from certain causes, one of them being a fracture of the jaw. Dr. Epstein, in his testimony, excluded all other causes except the possible one of abscess, and Dr. Snively excludes that by testifying that there was no abscess at the time he extracted the tooth, and the jury was justified in finding that all other causes, except the fracture, had been excluded.

A dentist is not an insurer of results; he is not answerable for infection, or results which follow the extraction of teeth, provided he has used due skill and care in the extraction and subsequent treatment. In offering his services to the public he impliedly contracts that he possesses and will use in the treatment of his patients a reasonable degree of skill and learning, and that he will exercise reasonable care, and exert his best judgment, to bring about good results. A failure to perform his duty renders him liable for injuries caused thereby. The standard of the degree of care, skill and diligence required of dentists is not the highest order of qualification obtainable, but is that degree of care, skill and diligence which are ordinarily possessed by the average of the members of the profession in good standing.

The evidence shows that the boy's lower left jaw bone was fractured about the point of the second bicuspid tooth. There was testimony from which the jury might find that this fracture was caused by the drawing of the tooth by Dr. Snively, and it is admitted by almost all the dentists who testified, including the defendant himself, that if sufficient force was used by the dentist at the time of the extraction of this tooth to cause a fracture. he did not act with reasonable skill, with ordinary skill and care, in the extraction of this tooth, and if he did not act with reasonable and ordinary skill and care

in the extraction and treatment of the tooth, he was negligent, and the defendant is responsible for this act.

As to the third assignment of error this court will not consider the question of excessive damages on appeal from a judgment at law.

We can only review matters of law as presented by the record.

A writ of error brings for review before the higher court the judgments of inferior tribunals upon matters of law only. *Delaware, &c., Railroad Co.* v. *Newark,* 63 *N. J. L.* 310.

As to the fourth assignment of error there was proof that when Dr. Snively extracted a deciduous molar tooth from the plaintiff's lower left jaw on January 20th, 1914, it gave instant relief to the aching tooth; when he extracted the second tooth, adjoining the former, on January 29th, 1914, it gave no relief to the pain. The dentist used a forceps, and when the father remarked that the tooth came out very easily, he replied, "It did not come out as easy as you think it did." The boy continued to cry and complained of great pain; he did not sleep that night, and for several nights, and he was frequently taken to the office of Dr. Betts, the defendant, and to various physicians, until it was decided to perform the operation of scraping the bone for a condition of necrosis, which Dr. Betts says he thought was present. When that operation of scraping the bone was performed by Dr. Epstein, he says that he then discovered that the boy's jaw was fractured. Previous to that time he had found *crepitus.* The testimony on the part of the plaintiff is that he had no other injury around that time which might have caused the fracture of this bone. The fracture was on the lower left jaw bone just about the point of the second bicuspid tooth. Dr. Epstein testified that assuming that the second and third tooth from the rear on the left lower jaw of the plaintiff had been extracted prior to his seeing him, the one nearest the end on January 20th, 1914, from which no result of pain or discomfort followed, and the second extraction of the third tooth on January 29th, 1914, followed by incessant pain and suffering

on the part of the patient, such a condition could be brought about through a fractured jaw, and that the conditions as he found them to exist in the boy's jaw could have been produced by the extraction of a tooth on January 29th, 1914; that there must have been some violence which caused the fracture of the jaw bone; there was no way to tell whether this violence which caused the fracture was applied from within or without, only that there was no external mark of violence; as a rule, there is contusion or discoloration, or swelling on the outside; the swelling was all on the alveolar process of the jaw; that in the extraction of a tooth there would be no visible outward evidence of the use of force or violence; that he made inquiry as to whether the boy had received a blow from anybody or had fallen, and took a full history of the boy's case and found nothing of that sort.

Dr. Doremus testified that a broken jaw bone could ensue from taking out a first deciduous molar if there had not been due care; that it was possible in the extraction of a first tooth, first molar, of a child ten years of age, to fracture the jaw bone, and explained that "the temporary tooth has roots on it; the permanent tooth which is beneath it is imbedded between the roots of the temporary tooth; if you do not gently loosen that tooth in the extraction, you get, possibly, half an inch of leverage which, at the end of that half inch is greatly multiplied, correspondingly with the power which is placed on the end that is not in the mouth, and thereby you could fracture the jaw," and that pressure is exerted against the temporary tooth and the permanent as well, and through that tooth against the jaw.

In addition to the testimony of Dr. Snively a number of dentists testified that, in their opinion, a deciduous molar, which it is admitted it was, in a boy ten years of age, would have no roots; and that, even though the roots have not been entirely absorbed, some of them say it would have been impossible for the dentist to have used such force in its extraction as to cause a fracture. The proofs show that there was a fracture of the jaw bone, and defendant claims that there was

no proof that the fracture resulted from any act on the part of Dr. Snively.

It was for the jury to say whether or not the inferences to be drawn from the facts lead to a conclusion that the fracture was caused by the extraction of the tooth.

As a general rule, if there is any evidence which, standing alone or considered apart from opposing evidence, is, if believed by the jury, legally sufficient, or might reasonably tend to support the verdict, though such evidence may not be of an entirely certain and satisfactory nature, it will not be disturbed. For, upon the mere weight of evidence, the jury are the judges. Inferences of fact are to be deduced by the jury, and whenever there is evidence from which an existence of facts sufficient to support a verdict might have been inferred, the verdict will not be disturbed. 3 *Cyc.* 348.

We are of the opinion that there was sufficient evidence to submit to the jury that the relation of master and servant existed between the defendant and Dr. Snively at the time of the extraction of the tooth by him on January 29th, 1914, and that the fracture of the plaintiff's jaw bone resulted from the negligent act of Dr. Snively in extracting the tooth, and that the motions for a nonsuit and to direct a verdict for defendant were therefore properly refused.

In every case where the issue depends upon the determination of facts, the existence of which is not admitted, the jury, not the court, must determine them. *Schmidt* v. *Marconi Wireless Telegraph Co. of America,* 86 *N. J. L.* 183.

A trial judge is only justified in granting a nonsuit or directing a verdict upon a court question arising from the admitted or uncontroverted facts of a case, and the weight of conflicting testimony should always be submitted to a jury for their consideration and determination. *Dickinson* v. *Erie Railroad Co.,* 85 *N. J. L.* 586; *Fulton* v. *Grieb Rubber Co.,* 72 *Id.* 35; *Clark* v. *Public Service Electric Co.,* 86 *Id.* 144, 151; *Tilton* v. *Pennsylvania Railroad Co., Id.* 709; *De-Vicenzo* v. *John Sommer Faucet Co.,* 87 *Id.* 645.

The judgment under review will be affirmed, with costs.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, WHITE, TERHUNE, HEPPENHEIMER, WILLIAMS, GARDNER, JJ.   15.

*For reversal*—None.