DONATHAN, Respondent, v. McCONNELL, Plaintiff.
No. 8695.
Submitted December 15, 1947. Decided March 22, 1948.
Rehearing Denied June 5, 1948.
193 Pac. (2d) 819.

231

Messrs. Jardine, Chase & Stephenson, of Great Falls, and Messrs. Walchli & Korn and Mr. Merritt N. Warden, all of Kalispell, for appellant. Mr. Hans Walchli and Mr. Warden argued the cause orally.

Mr. George E. Hurd, of Great Falls, and Mr. James B. O'Flynn, of Kalispell, for respondent. Mr. Hurd and Mr. O'Flynn argued the cause orally.

Messrs. Coleman, Jameson & Lamey, of Billings, Mr. Howard M. Lewis, of Bozeman, Mr. Dave Fitzgerald, of Livingston, Messrs. Loble & Loble, of Helena, Mr. Sid G. Stewart and Mr. J. B. C. Knight, both of Anaconda, Mr. W. T. Boone and Mr. Jac W. Rimel, both of Missoula, Mr. Sherman W. Smith and Mr. Edmond G. Toomey, both of Helena, Mr. H. R. Eickemeyer, of Great Falls, Mr. Hugh J. Lemire, of Miles City, Mr. H. Leonard DeKalb, of Lewistown, Mr. James T. Shea, of Glasgow, Messrs. Corette & Corette, of Butte, and Messrs. Foot & Aronson, of Kalispell, amici curiae. Mr. W. J. Jameson and Mr. E. G. Toomey argued the cause orally.

THE HON. GUY C. DERRY, District Judge (sitting in place of Justice GIBSON), delivered the opinion of the court.

This is an action for damages for injuries alleged to have been received by plaintiff as the result of the extraction of a tooth by the defendant, which operation was performed by defendant in his capacity as a dentist, and during the ordinary practice of his profession. Plaintiff prevailed in the trial court and defendant has appealed from the judgment with numerous assignments of error but with the principal contention that the

232

verdict is against the law and the evidence, and that the jury were improperly instructed on matters of law.

Plaintiff's action is based upon the premise that the defendant was negligent in the manner of extraction of his tooth and in the treatment which he gave and failed to give to plaintiff after the extraction was completed. The evidence, viewed in the light most favorable to the plaintiff, establishes substantially the following facts: Plaintiff, requiring the services of a. dentist to treat his upper left molar, which had .been causing him some trouble, and which he knew contained a small cavity, went to the office of the defendant on the 9th day of April, 1942, for the purpose of having the tooth treated. The defendant made an examination of the tooth and decided that it would be advisable to take an X-ray picture, and after examining the picture, advised the plaintiff that the tooth should be removed rather than filled. Thereupon, with the consent of the plaintiff, defendant began the operation leading to the extraction of the tooth. In the operation the tooth was broken off at the gum line, leaving two buccal roots and one lingual root still imbedded in the jaw. In removing the roots, the defendant made a hole in the antrum, and a piece of the floor of the antrum came out with one of the roots. During the process the alveolar artery was ruptured. Defendant informed the plaintiff a special packing was required, and one was inserted in the cavity. The nature of this packing is an important element in the case. The defendant, who gave the only direct evidence on this point, stated he placed a special packing, called a sulphapac, in the cavity left by the extraction of the tooth. This pack was a well known and generally used compound put out by a dental laboratory, and commonly used for the purpose of preventing infection. The pack consisted of a soft and soluable putty-like substance. Plaintiff went to defendant's office about 10 :00 o'clock and left there shortly before noon. He paid the defendant's fee of three dollars, covering the X-ray, extraction, and special packing. There is some dispute between the parties as to what was said at the time plaintiff left, he stating that the defendant told him that he was through and

it would not be necessary for him to return, and that he was advised by the defendant that the packing would absorb in the blood stream. There was some oozing of blood from the tooth socket at the time plaintiff left the office. According to plaintiff's version, after he left the defendant's office and had gone a distance of about three blocks toward his home, his nose started bleeding on the left side, his mouth filled with blood and he became deaf in both ears. The bleeding continued until stopped by a physician at his home. The blood was coming in a stream about the size of a match. It would let up a little and then another stream came out. His wife used some home remedies but these not giving any relief she went to a nearby store to telephone to the defendant. Mrs. Donathan testified that she informed the defendant, "Mr. Donathan just returned home from having that tooth extracted and has a severe nosebleed." She further testified as follows: "He said a tooth would lots of times do that, but it will quit in a little while, and if it did not quit, have him come back at one o'clock." "I repeated again, he was bleeding severely. He said it would stop in a little while. He still repeated to come back at one o'clock if it didn't stop."

When she returned to her home she got a four-pound coffee can and put a cup of water in it to keep the blood from sticking to the can and had her husband use the same to hold the blood coming from his mouth. His nose had stopped bleeding but blood continued to come from his mouth and plaintiff's wife thereupon went out to call in some neighbors, one of whom was a nurse. The nurse made some effort to stop the bleeding, and being unable to do so, advised that they call a physician, whereupon another neighbor went to the flour mill for the purpose of calling Doctor Ross. Doctor Ross responded to the call, arriving in about thirty minutes from the time that Mr. Donathan returned from the defendant's office. Doctor Ross testified that at the point of the tooth extraction he found "it was bleeding profusely" and he packed the cavity with cotton. According to Doctor Ross, the history of the case, given him by Mr. Donathan, was to the effect that there had been some packing

put into the cavity at the time of the extraction. He rolled up some cotton and put it into the cavity. He couldn't say how many packings he pressed into the cavity to stop the blood, but said it might have been two or three. He was there for ten or fifteen minutes, having waited around for some time after the packing had been inserted to see that the bleeding had stopped. Meanwhile the coffee can had become about half full of liquid composed of blood and water. The next time he saw the plaintiff was some eleven days later, on the 20th of April, at which time the plaintiff was brought to his office, complaining of a pain over his left antrum. He saw him after that time on the 24th and 27th of April, and on the 2nd, 10th and 15th of May, the latter date being the last time he saw him professionally. He gave him sulfadiazine and irrigated the cavity with boric acid.

From the time Doctor Ross treated him on April 9th, plaintiff was never at any time under the care of defendant, nor did he at any time return to defendant's office for treatment nor did he call on defendant to treat him. On April 13th plaintiff's wife testified she called defendant on the telephone. Her testimony on this point was as follows: "He answered the 'phone. He said, 'Dr. McConnell's office.' I said, 'This is Mrs. Donathan.' I was calling him about the packing Dr. McConnell had applied. This special packing, if it should be changed or removed. He said no, it was a special pack that should absorb in the blood stream. I said I didn't know, I thought it should be changed. He said no, I had nothing to worry about."

Defendant denied any such call was made. In any event, after the time of the call to the defendant immediately following the extraction, the above conversation, assuming it took place, was the only time defendant ever had any contact with plaintiff and it is all the notice defendant had of any claim of disability by plaintiff.

Plaintiff's proof divides his claim for damages into two definite parts. The first damage shown to be suffered is disability resulting from the loss of blood, alleged to have occurred because of the failure of defendant to provide proper

after care immediately following the extraction of the tooth. There is a sharp conflict in the evidence on the question of whether defendant was negligent in his method of treatment of plaintiff immediately following the operation. Since the weight of such testimony is for the jury we are only concerned with the question of whether there is any substantial evidence to sustain the verdict. There is competent evidence in the record from which the jury could find that defendant, having injected novocaine in the jaw before the extraction, which contracted the blood vessels in that vicinity, was negligent in not anticipating that as soon as the effect of the novocaine wore off, the blood would start flowing in dangerous volume from the ruptured alveolar artery, and further that a sulphapac would not long contain the wound, once the effect of novocaine had worn off, thus releasing the contracted blood vessels. There is also evidence to the effect that it was not in accord with good dental practice to leave sulphapac in a cavity without being irrigated out. Testimony offered in behalf of plaintiff tends to establish that, according to dental practice in that community, as soon as defendant was advised of the severe bleeding from the tooth socket, it was his duty to go to his patient and take care of his needs immediately rather than tell him to come to his office at some later time. While the above matters were established by expert evidence, there was other evidence of facts regarding the loss of blood and the cause and effect thereof, of such a nature that the jurors out of their common knowledge and experience were fully able to pass on the question of whether defendant was guilty of negligence in failing to go to plaintiff immediately upon being advised of the need. Malone v. Bianchi, 318 Mass. 179, 61 N. E. (2d) 1, 161 A. L. R. 1158; Richeson v. Roebber, 349 Mo. 132, 159 S. W. (2d) 658, 141 A. L. R. 1; Thomsen v. Burgeson, 26 Cal. App. (2d) 235, 79 Pac. (2d) 136.

The second and principal claim for damages is based upon the ▮ contention that defendant at the time of the extraction used a fabric or cotton packing in the cavity instead of a sulphapac, and that same was not absorbed in the blood as advised by

defendant, but on the contrary, having been left in the cavity for eleven days without being removed, caused infection which has led to plaintiff's present disability. The question presented on this phase of the case is whether there was any evidence from which the jury could find that the infection, admittedly a result of leaving the cotton pack in the cavity, was caused by any act or omission of defendant.

On April 20th, the first occasion when plaintiff visited Doctor Ross after the cavity had been packed by the physician at plaintiff's home, the doctor discovered that the antrum was infected. At that time he found that there was a piece of cotton in the cavity, which he removed, following which pus dropped out of the tooth socket. He testified that he presumed that the infection was caused by the cotton plug which he removed from the cavity on April 20th. Other testimony is to the same effect and that is the position taken by plaintiff throughout the case. Doctor Ross testified as a witness for the plaintiff, and on direct examination by plaintiff's counsel, the following questions were asked him and the following answers returned:

"Q. And was that plug put in there by you when you were called at 12:30 on the 9th of April? A. It could have been my plug. If the dentist didn't put any cotton in, I presume it was mine.

"Q. On the 9th you didn't find this plug? A. I don't know. It was bleeding. I put cotton in, filled the cavity to control bleeding. Q. Let's have it straight—did you say you put that plug in there? A. I might make myself clearer by saying I told him he should see his dentist to have it removed the following day.

"Q. Then you didn't put in the plug? A. I put the cotton packing in. Q. But those were below the packing the dentist put in? A. I don't know what he put in. Q. Was any in there you put in yourself in the lower part of the cavity? A. I filled it right up until I got the cavity filled, in order to check the bleeding.

"Q. Did you observe if there was any packing in the cavity,

did you make that observation, Doctor Ross? A. No sir. Q. You don't remember how many—please don't answer me when I am asking a question—I want to get this in the record correctly, you don't know at this time how many packings you put in the tooth to stop the blood? A. No, sir, I don't.

"Q. Did you later take two packings out? A. I took a piece out on the 20th. Q. Was it the packing that you put in? A. I don't know; I presume it was."

As a part of the examination of Doctor Ross, plaintiff's counsel offered in evidence a letter identified by Doctor Ross as having been written by him and either mailed or delivered to the plaintiff. The letter was dated December 7, 1942, and contained these statements among others: "I was called to your house on April 9th, about noon, to stop the bleeding from a tooth socket from which you had had a tooth extracted. The bleeding was profuse and you held an ordinary wash basin which was about one-half full of blood. Packing of cotton was packed into the tooth socket against the other packing which controlled the bleeding. Before leaving you were advised to remain in bed and be quiet."

On cross examination, the doctor testified: "There was blood flowing from this cavity and I simply packed the cotton right up against it * * *." Mr. Donathan stated, "there was packing in there is all I know about it."

Continuing Doctor Ross' cross examination:

"Q. This letter that was introduced, it stated you put your pack up against some other packing; what do you mean by that? A. Mr. Donathan said there was packing in there when he left the office. That is what I was referring to when I said I packed against it.

"Q. You took his word for it? A. Yes sir."

Doctor Ross, as plaintiff's witness, also testified with respect to the time of treatment of plaintiff, on a matter which we think is controlling, as follows:

"Q. And what instructions did you give him? A. I told him first that I put in this pack and that he should have it out

in the next 24 hours, and see his dentist. Before I left he got a little faint and laid down on the bed. I repeated it and he said, 'I don't think I will feel well enough to go up.' I said, 'then you call your dentist and have him take care of it.'

"Q. You told him to see his dentist? A. Yes, sir, and he volunteered the information himself that he didn't know if he would feel well enough to go up. I told him to get in contact with his dentist and have him see him. Q. Would cotton packing in a cavity of that kind, left in more than 48 hours, say, lead to or cause infection in the antrum? A. It might start infection after that time, yes.

"Q. Well, in medical practice, how soon should a cotton pack be removed? A. Twenty-four or forty-eight hours, usually. Q. And why? A. It becomes very putrid and has a possibility of starting infection there."

The nurse who was present when Doctor Ross treated plaintiff to stop the hemorrhage, testifying as a witness for plaintiff, was asked this question: "At the time before you left, did Doctor Ross give any instructions to his patient as to what to do?" (Answer) "He referred him back to his dentist." This testimony was uncontradicted. Again, Doctor Ross testified on the following pertinent matter:

"Q. You treated the patient then, until about May 15, is that right? A. That's correct.

"Q. When you discharged him, what have you to say whether or not he had recovered from his ailment.and the loss of blood? A. Well, I thought he was pretty well recovered from his ailment; his blood was good. Checked his urine, it was good. His blood pressure was good and showed a regeneration from the loss of blood."

The plaintiff gave no testimony with regard to the type of packing put in by the defendant, which contradicted the statement of defendant that a sulphapac was inserted following the extraction. On being questioned as to whether he could tell what was in the packing put in the cavity by defendant after the extraction was completed, plaintiff answered: "No, I don't

know what he used in the packing." Plaintiff, recalled to the stand on the third day of the trial, testified that he observed the number of cotton packings that Doctor Ross had inserted into the cavity and had counted them as they were put in. In this connection he testified that one cotton packing was inserted between the jaw and the cheek and that two pellets were placed or pressed into the opening. He then testified that later in that day and on the succeeding day, at different times, three pieces of cotton had come from his mouth. On this testimony the jury was asked to draw the conclusion that since as observed by him, only three packs were inserted by Doctor Ross and he accounted for three packs which came from his mouth and the cavity, the packing which was removed on April 20th by Doctor Ross and found to be cotton, and which, it is conceded, caused the infection, must of necessity have been placed there by defendant at the time of the extraction. Plaintiff was the only person testifying as to the number of cotton packs placed in the cavity. At the time of making such observation, he was sitting in a chair, leaning back, in such a position that the doctor could look into his mouth. Neither the nurse, who was holding a flashlight so as to expose the cavity for the assistance of the physician, nor the doctor himself, could remember the number of packs inserted. The fact that the packing inserted by defendant was soluble and not cotton is strongly corroborated by the fact that blood gushed from the cavity in a stream the size of a match and that there was profuse bleeding from the socket before Doctor Ross packed the cavity. In answer to questions as to where blood was coming from when he first observed plaintiff, Doctor Ross testified "it was flowing from the cavity of the extracted tooth * * *" "I just found it was bleeding profusely and I packed it with cotton." The plaintiff and Doctor Ross both testified the packing removed by Doctor Ross was a cotton "plug."

If we accept the inference plaintiff desires to draw from his testimony, we must conclude that while at the time of insertion it did not fill the cavity sufficiently to stop the blood, of all the packings inserted it alone remained fixed for a period of eleven

days before removal by the physician. It needs no testimony to determine that such cotton plug would have to have been of such size as to fill the cavity in an upper jaw and firmly implanted in order to remain for eleven days without coming loose, and the evidence of the flowing of blood from the cavity furnished strong proof no cotton "plug" was present at that time. In any event we do not deem it necessary to decide whether such testimony was sufficiently credible to make a case for the jury. To establish the needed fact plaintiff relies upon the inference that the cotton plug must have been put there by defendant because plaintiff counted the number of pieces of cotton put in by Doctor Ross and the number of pieces that came from his mouth, thereby accounting for all cotton put in by Doctor Ross, and the additional inferences, first, that the cotton came out in the form it went in, and second, that the cotton coming from his mouth was the cotton placed there by defendant rather than that admittedly placed there by Doctor Ross. There is nothing in evidence to show that the cotton placed there by Doctor Ross did not go to the bottom of the socket. Seemingly it had to do so to "fill the cavity" and stop the blood. There is nothing more than speculation as to which cotton was on the bottom or side, or where such first packing was pushed or placed by the pressing in of the cotton by Doctor Ross. Assuming for sake of argument that an inference may be drawn from such testimony that defendant placed cotton in the cavity, we are not permitted to draw the additional inference based on the first, that the cotton placed there by the defendant remained and that placed by Doctor Ross came out or that all the cotton placed there by Doctor Ross came out because the same number of pieces came out as went in. That the cotton came out in pieces, rather than in pellets as put in, is indicated by plaintiff's testimony that on April 18th, "a piece of packing, a string hung down in my mouth and bothered me."

If the identical cotton removed by Doctor Ross eleven days after the extraction was not placed there by defendant then even under plaintiff's theory of the case, defendant could

not be liable for such infection. The applicable rule is thus stated by this court in the case of Park v. Grady, 62 Mont. 246, 252, 204 Pac. 382, 384: "Upon a motion for nonsuit everything will be deemed to be proved which the evidence tends to prove. (Citing cases.) No cause should be withdrawn from a jury unless the conclusion from the facts necessarily follows, as a matter of law, that no recovery could be had upon any view which could reasonably be drawn from the facts which the evidence tends to establish. However, under this rule, the record must contain competent testimony fairly tending to affirmatively prove the allegations of the complaint. The burden of proof is still upon the plaintiff, and is not satisfied if the conclusion to be reached from the testimony offered is merely a matter of conjecture. If such conclusion be equally consonant with the truth of the allegations, and with some other theory inconsistent therewith, it then becomes a mere conjecture, and the rule of the burden of proof is not satisfied." We think that the conclusion to be drawn from the testimony here is at least as equally consonant with the theory that the cotton plug removed by Doctor Ross on April 20th was placed there by the physician on April 9th, as that it was placed there by the defendant, and this being true, plaintiff offered mere conjecture as proof.

For still another reason plaintiff cannot recover for damages caused by the infection from the cotton plug. As we have before observed, plaintiff's own witness, Doctor Ross, when he testified as a witness for the plaintiff, said he directed the plaintiff to return to his dentist within twenty-four hours and have the packing removed. He also testified that upon the plaintiff's volunteering the information that he did not think he would feel well enough to go, Doctor Ross directed the plaintiff to get in touch with his dentist and have the dentist see him. Notwithstanding the specific direction, plaintiff did not return to the dentist nor get in touch with either defendant or Doctor Ross to have anything done about removing the pack for a period of some eleven days, during which time the infection had set in.

The infection caused by the fabric packing was not the natural and probable consequence of (compare 25 C. J. S., Damages, sec. 25, and 15 Am. Jur., p. 408) or proximately due to the manner of extracting the tooth but was due to the independent intervening cause of allowing the fabric packing to remain in the cavity too long.

The case was tried in the district court on the theory that a ██ dentist in the conduct of his profession is governed by the rules applicable to a physician and surgeon in respect to the degree of care and skill required in the treatment of a patient. While this question has never been decided by this court, such theory is in accord with the holding of the courts generally where this question has been presented. 48 C. J. 1113, note 47, and annotations in 69 A. L. R. 1143 and 129 A. L. R. 101. We hold the above rule, as adopted by the trial court, to be correct.

The rule as to physicians and surgeons, as defined by this court, is set out in Hansen v. Pock, 57 Mont. 51, 58, 187 Pac. 282, 284, as follows: "It is the rule, recognized by the courts generally, that when one holds himself out as a physician or surgeon, whether licensed or not, and accepts employment as such to treat a patient, he assumes toward the patient the obligation to exercise such reasonable care and skill in that behalf as is usually exercised by physicians or surgeons of good standing, of the same system or school of practice in the community in which he resides, having due regard to the condition of medical or surgical science at that time." In Schumacher v. Murray Hospital, 58 Mont. 447, 467, 193 Pac. 397, 403, this court said: "In Hier v. Stites, 91 Ohio St. 127, 110 N. E. 252, the court said: 'In an action against a physician and surgeon for negligent treatment, * * * plaintiff must show that defendant's treatment either did something that physicians and surgeons of ordinary care, skill, and diligence would not have done under like or similar conditions, or that defendant omitted to do some particular thing that they would have done under like or similar conditions, and must further show that the injury * * * resulted from the neglect or omission shown'." Applying

the rule to dentists, the court of Errors and Appeals of New Jersey, in Klitch v. Betts, 89 N. J. L. 348, 98 A. 427, 429 said: "A dentist is not an insurer of results; he is not answerable for infection, or results which follow the extraction of teeth, provided he has used due skill and care in the extraction and subsequent treatment. In offering his services to the public he impliedly contracts that he possesses and will use in the treatment of his patients a reasonable degree of skill and learning, and that he will exercise reasonable care, and exert his best judgment, to bring about good results. A failure to perform his duty renders him liable for injuries caused thereby. The standard of the degree of care, skill, and diligence required of dentists is not the highest order of qualification obtainable, but is that degree of care, skill, and diligence which are ordinarily possessed by the average of the members of the profession in good standing."

A surgeon who has operated on a patient must not only operate with ordinary skill and care, but must also provide after care for the patient. The editor of California Jurisprudence states the rule as follows: "The physician or surgeon, being employed in his professional capacity, is charged with certain duties and obligations, for failure in the performance of which he is held to incur legal liability to the patient. Having undertaken to treat the patient, he is within limitations bound to continue his services; and if in a critical situation he abandons the patient, he may be held liable in an action for damages. After having performed an operation, the practitioner is bound to give such attention as the patient's condition may demand, in the absence of special agreement with or notice to the patient." 20 Cal. Jur. 1073. Under the rule applying to dentists above stated, and under testimony as applied to the practice of dentistry in the community here affected, as brought out by the evidence, the defendant owed the duty to plaintiff while under his care to see that plaintiff did not leave his office while there remained danger of hemorrhage, and the further duty, on being advised of plaintiff's condition, to immediately render

such care and attention as was reasonably necessary to relieve his condition. There was sufficient evidence before the jury, testified to by witnesses for plaintiff, from which they could find that defendant failed in his duty to plaintiff in both these respects. It is true plaintiff was given full relief by Doctor Ross but the evidence tends to show that plaintiff, during the period of time before the physician arrived, suffered loss of considerable blood. If the version of plaintiff's witnesses be accepted it was sufficient to cause considerable damage to his system. He was bedfast for a considerable time and suffered other damage. The damage so suffered was for the jury to appraise. The fact that defendant took the position that plaintiff had made out a case for the jury for some damages is borne out by the fact that he neither asked for a nonsuit or directed verdict, nor raised the question of failure of proof. Compare Williams v. Hample, 62 Mont. 594, 205 Pac. 829. It might be remarked that the trial court could hardly rule out the claim for damages for infection as we have here done, where no request was made for such a ruling during the trial.

This case has been twice tried to a jury, all at a great expense to the litigants and to the taxpayers of Flathead county. There should be an end to this litigation if it is at all possible to do so without doing violence to legal principles. Realizing the method is not to be commended, but having in mind many cases where this court has seen fit to scale the verdict to cover the damages where same can be measured with some degree of accuracy, the latest being Cline v. Tait, 116 Mont. 571, 155 Pac. (2d) 752, the majority of the court are of the opinion that a new trial should be granted unless the plaintiff agrees to a reduction of the verdict from $12,500 to $4,000 which sum the court believes will fully compensate the plaintiff for any damage incurred as a result of the actionable negligence here proved by plaintiff.

The court is of the opinion that if this case is to be retried, and upon the same evidence as applied to the facts under which we have here held plaintiff may recover, defendant's offered

instructions Nos. 16, 17, 18 and 19 should be given. Defendant's offered instruction No. 22 should be given in event any evidence is offered which makes it applicable. Since the instructions are applicable only to the facts peculiar to this case, no useful purpose will be served by reciting them.

It is accordingly ordered that the opinion in this cause heretofore on May 21, 1947, pronounced by this court be withdrawn and this opinion be substituted therefor; that the cause be remanded to the district court with directions to grant a new trial unless within thirty days after the remittitur is filed with the clerk of that court, plaintiff shall file his written consent that the judgment for damages be reduced to $4,000. If such consent is filed, the judgment will be modified accordingly as of the date of its original entry, and, as so modified, will stand affirmed. Each party shall pay his own costs on this appeal.

Associate Justices Choate, Angstman and Metcalf concur.

MR. CHIEF JUSTICE ADAIR dissents.

Opinion on rehearing March 22, 1948.