CAROLYN CALLAHAN AND JAMES PATRICK CALLA-
HAN, PLAINTIFFS AND APPELLANTS, *v.* F. HANLEY BURTON,
DEFENDANT AND RESPONDENT.

No. 11980
Submitted June 17, 1971.
Decided July 26, 1971.
487 P.2d 515.

Bolinger & Wellcome, Page Wellcome, argued, Bozeman, for plaintiffs and appellants.

Poore, McKenzie & Roth, Robert Poore, argued, Urban L. Roth, argued, McCaffery & Peterson, John L. Peterson, appeared, Butte, for defendant and respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal by Carolyn and James Callahan, husband and wife, from a judgment entered on the district court's order dismissing their case against the defendant, F. Hanly Burton, which was made following the plaintiffs' case in chief and from the order of the court denying plaintiffs' motion for a new trial.

Plaintiff, Carolyn Callahan, failed to pass the visual acuity portion of the state driver's license test in April 1969. She had passed the same test two years earlier in April 1967. She then went successively to Doctors Harvey Casebeer of Butte, and Everett Lensink of Bozeman, who examined her and suspected she might have a malignant melanoma of the left eye. This suspicion was confirmed by Dr. Frank C. Winter, of Stanford University School of Medicine, in Palo Alto, California. Mrs. Callahan returned to Butte and her left eye was enucleated by Dr. Casebeer on April 14, 1969.

Defendant, Dr. F. Hanly Burton, an ophthalmologist of Butte, had been Carolyn's family eye doctor from the time she was a girl of age six or seven until November 1966, when she left Butte to attend college in Bozeman. Commencing in 1957, Carolyn was taken to Dr. Burton each fall for a routine eye check; he saw her each fall in the years 1958 through 1961, in 1963, and finally on November 30, 1966. Carolyn was accompa-

nied by her mother on each visit, until she was married at age 18 in December 1961. She was 27 years of age at the time of trial.

For the examinations of 1963 and 1966, Carolyn was by herself. Carolyn was fitted to corrective glasses in November 1966 by Dr. Burton. Her left eye vision was corrected to 20-20. In April 1967, she passed the driver's visual acuity test but in April 1969, she failed the same test. A few days later, Dr. Casebeer was unable to correct her left eye vision to 20-20 because of a tumor in the ciliary body which required the hereinbefore mentioned enucleation. This was some two and one-half years after Dr. Burton's last examination. On August 7, 1969, she filed suit against Dr. Burton, claiming that he had failed to diagnose and treat the cancerous condition which occasioned the loss of her left eye.

To hold defendant liable for alleged failure to diagnose and treat the cancer, plaintiffs have the burden of proving that it existed sometime during the treatment period in a reasonably diagnosable condition.

Plaintiffs assign error to the district court's granting of defendant's motion to dismiss at the conclusion of plaintiffs' case in chief and in denying plaintiffs' motion for a new trial. The primary question presented is whether there was any credible evidence of the existence of the cancerous condition in a reasonable diagnosable condition during the period of Dr. Burton's treatment.

Plaintiffs embarked upon their proof of claim by adducing lay witness testimony that over a period of eleven years beginning in 1958, Carolyn's left eye had gradually changed color from blue to hazel to brown. Carolyn's mother testified she called this to Dr. Burton's attention in a conversation in a hallway in 1958, and that Dr. Burton dismissed it as nothing to worry about. Various pictures were introduced showing a change in the eye. During the same general period of Dr. Burton's treatment, four other doctors, although not ophthal-

mologists, examined Carolyn's eyes but noted no eye pathology nor apparently received any complaints.

Plaintiffs produced no expert testimony that at any time during Dr. Burton's care Carolyn had any pathological condition. Their expert proof was confined to hypothetical questions based upon the earlier mentioned testimony of lay witnesses as to the change of eye color. Doctors Lensink and Casebeer testified. Dr. Lensink saw Carolyn only once on consultation. Dr. Casebeer examined her, sent her to Dr. Lensink, enucleated the eye on her return from Stanford, studied the pathology reports, and did follow up examinations.

■ Plaintiffs' principal claim of error goes to the granting of the motion to dismiss at the conclusion of plaintiffs' case. Primarily, in their brief, plaintiffs complain about the cross-examination of Dr. Casebeer. Plaintiffs called Dr. Casebeer heretofore noted as the one person, an expert too, who possessed the totality of Carolyn's medical picture on her left eye. To examine the issue, we note that at the conclusion of plaintiffs' case plaintiffs moved the court to amend the complaint to conform to the evidence and also moved as follows:

"* * * that at this time the Court declare [plaintiffs' witness], Dr. Casebeer, an adverse witness for cross examination as adverse testimony, adverse to the plaintiff. We rest."

The court ruled upon this motion by granting the motion to amend and denying the motion pertaining to Dr. Casebeer's testimony. Thereafter defendant moved to dismiss. The court ruled as follows:

"I am taking a look at the overall situation. In view of your predicament with him [Dr. Casebeer], if you recall I permitted you approximately 15-20 minutes cross examination as though he were an adverse witness. I am just going on the record as it is here. Dr. Burton was doubtful whether there was any possibility of his discovering this situation, and now it develops that even had he discovered it, no power on earth could have saved this little lady's eye. It's just a tragic thing we can't do anything about here."

On direct examination of plaintiffs' witness, Dr. Casebeer, it is significant that he was *not* asked certain questions. For example, he was not asked whether in his opinion Carolyn was even afflicted with eye cancer during any of the period of Dr. Burton's treatment from 1957 to 1966. He was not asked where the origin of the tumor was. This was important to determine whether the cancer was reasonably discoverable or diagnosable or even further, whether it would have been discoverable in time to save the eye in any event. Neither was he asked the significance of the facts that Carolyn's vision in 1966 was correctable to 20-20 vision and that she passed the driver's vision test in April 1967.

Other than purely hypothetical questions to Drs. Casebeer and Lensink which were answered conditioned upon how the eye appeared at the time to an expert, no medical testimony was produced as to the reasonable likelihood of the existence of cancer at the time of Dr. Burton's treatment 29 months earlier.

So the record stood at the time of Dr. Casebeer's cross-examination. Plaintiffs' exhibit No. 16, introduced on direct examination, was Dr. Casebeer's entry made the night before he enucleated the eye. It read:

"The patient is scheduled for an enucleation of the left eye in the morning, with an integrated implant if possible. *It is conceivable that the present lesion has been present for five years,* and thus the possibility of spread to other structures is a distinct possibility." (Emphasis added)

On cross-examination Dr. Casebeer was asked the crucial questions of where the tumor arose and when it arose. Here, we emphasize that even before Dr. Casebeer's cross-examination, there was no medical proof that the tumor was present during Dr. Burton's care. But, even accepting as proof Dr. Casebeer's entry *before* the operation that it was "conceivable" that the tumor was present for five years, Dr. Casebeer clearly and unequivocally testified on cross-examination that the tu--

mor began in the ciliary body of the eye; that because of this the eye was doomed by the time the tumor was detectable; and further, that in his opinion the tumor was probably not present during the period when Dr. Burton was treating her.

Plaintiffs claim surprise at Dr. Casebeer's cross-examination responses, but we have read and reread the transcript and find no merit in the claim.

As said before, plaintiffs' exhibit No. 16, the entry of Dr. Casebeer which was introduced into evidence, indicated that Carolyn had a malignant melanoma of the iris. Plaintiffs further submitted the affidavit of Dr. William D. Hill, a certified and eminently qualified pathologist, who examined slide #69-146(3) prepared by the Stanford University School of Medicine, Eye Pathology, which is a slide prepared from Carolyn's left eye after it had been enucleated. The net of Dr. Hill's statement is:

"That the age of the spindle and epithelioid cells found in the iris and ciliary body is impossible to determine with exactness by any pathological study; that in general lesions of the eye grow slowly and may be present for many years but it is impossible to state how long a lesion has been present based upon a pathological examination of the lesion as it is exhibited in the slide hereinabove referred to;

"That it is impossible to determine from an examination of the slide and based upon the cellular structure whether the lesion started in the iris or the ciliary body since both the iris and the ciliary body are invaded by spindle and epithelioid cells."

Giving the greatest weight possible to the above testimony and to the testimony of Dr. Casebeer would yet fail to establish a prima facie case in that there was lacking any evidence that the malignant melanoma of the iris was present in a diagnosable state during the period that Dr. Burton treated Carolyn.

Plaintiffs go on to argue that they should not be bound by

the testimony of their own witness, Dr. Casebeer, whose testimony on cross-examination was adverse to their case and which plaintiffs claim came as a surprise and as such the law does not require that they be bound by it.

32A C.J.S. Evidence § 1040(1), reads as follows:

"The party calling a witness is not bound by his testimony where it is inherently improbable, is due to mistake, *or is not a statement of fact, but a mere estimate or expression of opinion; or where, to the party's surprise, the witness turns out to be unfriendly, or testifies to the contrary of what the party was in good faith led to expect;* or where the witness is adverse or hostile, but it was necessary to call him in order to make out a prima facie case or matter of defense." (Emphasis added)

Fort Worth & Denver Railway Company v. Janski, 223 F.2d 704, 709 (5th Cir. 1955), supports this general rule as follows:

"Dr. Jackson, also an orthopedic surgeon, whose deposition was taken on plaintiff's behalf, said that the plaintiff 'is probably—as I say, I am not quite sure just exactly what a fireman has to do, but I think he probably has at least 25% permanent disability'. The defendant urges that as the plaintiff offered the testimony of Dr. Jackson he is bound by Dr. Jackson's opinion as to the degree of disability. *The general rule that a party who tenders a witness vouches for his credibility is not to be extended so as to bind a party to the opinion of an expert.*" (Emphasis added)

Yet, even dismissing the adverse testimony of Dr. Casebeer, the cause still fails for want of establishing proximate cause. In Donathan v. McConnell, 121 Mont. 230, 241, 193 P.2d 819, 824 it was stated by this Court, citing Park v. Grady, 62 Mont. 246, 252, 204 P. 382, 384:

" 'Upon a motion for nonsuit everything will be deemed to be proved which the evidence tends to prove. (Citing cases.) No cause should be withdrawn from a jury unless the conclusion from the facts necessarily follows, as a matter

of law, that no recovery could be had upon any view which could reasonably be drawn from the facts which the evidence tends to establish. However, under this rule, the record must contain competent testimony fairly tending to affirmatively prove the allegations of the complaint. *The burden of proof is still upon the plaintiff, and is not satisfied if the conclusion to be reached from the testimony offered is merely a matter of conjecture.* If such conclusion be equally consonant with the truth of the allegations, and with some other theory inconsistent therewith, it then becomes a mere conjecture, and the rule of the burden of proof is not satisfied.'" (Emphasis added.)

The standard of proof required in the instant case is set forth in Ewing v. Goode (C.C.) 78 F. 442, as cited in Schumacher v. Murray Hospital, 58 Mont. 447, 462, 193 P. 397, 402:

"'* * * But when a case concerns the highly specialized art of treating an eye for cataract, or for the mysterious and dread disease of glaucoma, with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence. There can be no other guide, and, where want of skill or attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury. Again, when the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough to show the injury, together with the expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that negligence did cause the injury.'"

The plaintiffs did not meet the standards of proof. Thus, the court properly directed a verdict in favor of defendant and denied a motion for a new trial.

The plaintiffs assign error to the court's allowing the defendant's attorneys to examine the plaintiff's medical witnesses other than by deposition and interrogations.

Plaintiffs refused to permit defense counsel to talk to the attending physicians. Even though defense counsel had deposed Dr. Lensink without objection, when a conference was set up with Dr. Lensink, plaintiffs' counsel did not want defense conferring with Dr. Lensink other than in plaintiffs' counsel's presence. Defense counsel gave notice and moved the trial court for an order permitting a private conference under Rule 35(b) (2), M.R.Civ.P.

On April 28, 1970, the court ruled in pertinent part by order as follows:

"The Court being fully advised of the facts and the law, found that Rule 35(b) (2) of the Montana Rules of Civil Procedure was adopted to expedite and to effectuate full and complete discovery of an opponent's case; that the purpose of the rule would be defeated if counsel were not given the opportunity to interview a treating and attending physician on the same basis of any other witness; that the plaintiff by filing her action alleging personal injuries and damages as a result of the negligence of the defendant waived any privilege she might have as to any of her treating and attending physicians and specifically Doctors Lensink and Casebeer; further, that the plaintiff, by agreeing to the deposition of Dr. Lensink had specifically waived any physician-patient privilege she might have had with regard to Dr. Lensink. It is therefore ordered that Poore, McKenzie & Roth, the law firm representing the Defendant, be permitted to interview Doctors Lensink and Casebeer outside the presence of counsel for the Plaintiff and that any physician-patient privilege existing between Carolyn Callahan and said Doctors has been waived."

The so-called physician-patient privilege is not a creature of the common law but is solely a creature of statute. Only approximately two-thirds of the states of the United States have adopted a privilege-communication statute. Hague v. Williams, 37 N.J. 328, 181 A.2d 345, 348; 8 Wigmore, Evidence, § 2380 (McNaughton rev. 1961).

Montana did so in 1867 by enacting section 93-701-4, R.C.M. 1947:

"There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person cannot be *examined as a witness* in the following cases:

"*    *    *

"4. A licensed physician or surgeon cannot, without the consent of his patient, *be examined in a civil action* as to any information acquired in attending the patient, which was necessary to enable him to prescribe or act for the patient." (Emphasis added.)

The above cited statute was strictly construed and held not to extend to a criminal case. State v. Campbell, 146 Mont. 251, 405 P.2d 978.

The physician-patient privilege is an anachronism which has come under considerable criticism and attack as the great volume of personal injury suits increased. 8 Wigmore, Evidence, § 2380a (McNaughton rev. 1961); McCormick on Evidence, § 108.

The Montana Supreme Court notified all licensed attorneys in the state of Montana that an amendment had been proposed to Rule 35, M.R.Civ.P., which would abolish the privilege whenever a plaintiff commenced "an action which places in issue the mental or physical condition of the party bringing the action  *  *  *  regarding the testimony of every person who has treated, prescribed, consulted, or examined or may thereafter treat, consult, prescribe or examine such party in respect to the same mental or physical condition  *  *  *."

After notice of the proposed amendment was sent to all counsel, attorneys were given to and including May 25, 1967, within which to prepare, serve and file memoranda in opposition or in support of the proposed rule change. In addition, sixteen lawyers were given permission to appear in oral argument at a hearing to be held on the proposed change June 9,

1967. Certain modifications of the proposed amendment were submitted. One proposed that the testimony of any treating and attending physician be reduced to writing at pretrial deposition. Another suggested amendment proposed that treating and attending physicans' testimony should not include diagnosis, prognosis, or expert opinion or expert testimony but should be limited solely to the facts within the personal knowledge of the person. Neither of these amendments was adopted when the Supreme Court ordered the Rule to be amended September 29, 1967, and proclaimed its effective date as January 1, 1968.

Judge McClernan's order of April 28, 1970, accorded with the new rules and with these concepts.

In the instant case the defendant did not seek such an order from Judge McClernan until the plaintiffs refused to permit defense counsel to talk to the attending and treating physicians. This was very shortly before Judge McClernan's order of April 28. As of that time defendant had already taken the deposition of Dr. Lensink of March 5 without objection; so, even without the authority of Rule 35, the deposition itself waived any question of privilege. 58 Am.Jur., Witnesses, § 450; 97 C.J.S. Witnesses § 310, p. 864; 5 A.L.R.3d 1244; 25 A.L.R.3d 1401. Plaintiffs here are endeavoring to revive some form of amendment to the new Rule 35(b) (2), M.R.Civ.P., as adopted by the Supreme Court and to create some form of waiver that is incomplete. The pertinent language of the rule as adopted by the Supreme Court is perfectly clear:

"* * * by (2) commencing an action which places in issue the mental or physical condition of the party bringing the action * * * the party * * * waives any privilege he may have * * *." Any retreat from that simple rule will spawn confusion and a host of "exceptions". Any exception will hinder discovery and the early ascertainment of truth and, hence, will prolong litigation and impede settlements.

Something less than a complete waiver is not what was intended by the Court's wording of the rule itself.

"A waiver of the privilege with respect to confidential communications extends to the whole transaction, and such waiver cannot be limited to a particular purpose or person." 97 C.J.S. Witnesses § 314, p. 869.

The waiver of the privilege extends to pretrial investigation. Lane v. Boicourt, 128 Ind. 420, 27 N.E. 1111.

In Collins v. Bair (Ind.1969), 252 N.E.2d 448, Indiana judicially abolished the physician-patient privilege upon institution of a civil suit which involves a party's mental or physcal condition. Other jurisdictions have done likewise. Mathis v. Hilderbrand (Alaska 1966), 416 P.2d 8.

In Hague v. Williams, 37 N.J. 328, 181 A.2d 345, the plaintiffs sued the defendant doctor for advising the insurance company to whom the plaintiffs had applied for life insurance on their minor child, that the minor child had heart trouble. Plaintiffs alleged breach of confidential communication. The court held that no cause of action existed.

Gailitis v. Bassett, 5 Mich.App. 382, 146 N.W.2d 708, 709, involved a situation precisely on all fours with the instant case. In that case, upon defendant's motion, the court authorized defense counsel a private interview with plaintiff's doctors in a malpractice suit and concluded:

"We find no error in authorizing defendant's counsel to interview plaintiff's physician."

See also Lind v. Canada Dry Corporation (D.C.Minn.1968), 283 F.Supp. 861.

Plaintiffs cite two authorities in support of their contention that Judge McClernan was in error. They are Alexander v. Knight, 197 Pa.Super. 79, 177 A.2d 142; Hammonds v. Aetna Casualty & Surety Company, 243 F.Supp. 793 (N.D.Ohio, E. D.1965). But, neither jurisdiction has a rule of privilege waiver comparable to Montana's Rule 35(b) (2), M.R.Civ.P.

Rule 35(b) (2) was adopted after notice to the bar and

extensive briefs and argument. It clearly specifies that when a personal injury suit is filed, the physician-patient privilege is *waived*. As such, there is no longer any cloak hiding a pretrial determination of the truth by all interested parties. By filing her suit and also by submitting Dr. Lensink for deposition purpose, *any* privilege concerning the subject matter of Carolyn's left eye was permanently waived. Judge McClernan did not err in so holding and in permitting defense counsel to interview medical witnesses before trial.

The foregoing discussion meets the issue head on. However, some members of this Court do not go so far. They believe that Rule 35(b) (2), M.R.Civ.P., should be interpreted so that a court may not order an exclusive interview as here. This view however does not detract from our holding here as to the result because in any event, if there was error, it was harmless. Here, Dr. Lensink's deposition was taken in March, without objection. Then prior to trial Judge McClernan made his challenged order. Then plaintiffs called both Dr. Casebeer and Dr. Lensink as their witnesses at the trial and the cross-examination was made without any question of privilege. The defendant did not attempt to impeach nor discredit their testimony. Thus there was no prejudicial error.

The final assignment of error, that the court erred in allowing ex parte conferences with the defendant's attorneys is not supported by the record.

Judgment is therefore affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES JOHN C. HARRISON and DALY, concur.

MR. JUSTICE HASWELL, (specially concurring) :

I concur in the foregoing opinion and what is said therein with one exception to which this separate opinion is directed.

The district judge, by court order dated April 28, 1970, not only held that the physician-patient privilege was waived as between plaintiff and Doctors Lensink and Casebeer, but also

ordered that "the law firm representing the Defendant be permitted to interview Doctors Lensink and Casebeer outside the presence of counsel for the Plaintiff  *  *  *". The vice of this order lies in barring plaintiff's counsel from knowledge of the fruits of her adversary's discovery under Rule 35 thereby opening the way for surprise at the trial. If the purpose of Rule 35 and the other discovery rules in the Montana Code of Civil Procedure is to facilitate a search for the truth and to prevent surprise at the trial, how is such purpose promoted by a court order authorizing secret interviews between defense counsel and plaintiff's medical witnesses? I believe it the duty of this Court to sound off loud and clear in condemning such orders.

I consider the error to have been harmless under the circumstances of this particular case as the record amply demonstrates no surprise to plaintiff.