953 P.2d 561

Rose O'NEAL, Plaintiff–Appellant,

v.

Dr. Henry HAMMER, Individually and in his capacity as a professional corporation, Dr. Henry Hammer, Inc., and Dr. Lewis Williamson, Individually and as a professional corporation, Dr. Lewis Williamson, Inc., Defendants–Appellees,

and

Dr. Ray Berringer, Individually and in his capacity as a professional corporation, Dr. Ray Berringer, Inc.; John Does 1–10; Jane Does 1–10; Doe Partnerships 1–10; Doe Corporations 1–10; Roe "Non–Profit" Corporations 1–10; and Roe Governmental Entities 1–10, Defendants.

No. 19275.

Supreme Court of Hawai'i.

Feb. 25, 1998.

As Amended March 3, 1998.

Peter Van Name Esser, on the briefs, for plaintiff-appellant.

Douglas T.Y. Lee, Steven H. Lee with him on the briefs of Lee, Kim, Wong,Yee & Lau, Honolulu, for defendant-appellee Dr. Henry Hammer.

Mary L. Lucasse, William A. Bordner with her on the briefs of Burke, Sakai, McPheet-ers, Bordner, Iwanaga & Estes, Honolulu, for defendant-appellee Dr. Lewis Williamson.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

Plaintiff-Appellant Rose O'Neal appeals from the judgment of the First Circuit Court in a dental malpractice case. O'Neal filed claims for lack of informed consent and professional negligence. In her informed consent claim, O'Neal alleged that Defendant–Appellee Dr. Henry Hammer, an orthodontist, and Defendant–Appellee Dr. Lewis Williamson, an oral surgeon (collectively Appellees), failed to properly inform her of the risks involved in a surgical procedure, which was performed by Defendant Dr. Ray Berringer. In her professional negligence claim, O'Neal alleged that Appellees negligently advised her to have the surgery performed.

During the trial, the circuit court granted Appellees' motions for directed verdict on the informed consent claim on the basis that neither Appellee had a duty to inform O'Neal of the surgical risks. The professional negligence claim was submitted to the jury, which returned a special verdict in favor of Appellees and against O'Neal.

On appeal, O'Neal contends that the circuit court erred when it granted the directed verdicts and that the circuit court abused its discretion by "improperly and unnecessarily" barring the introduction of O'Neal's proffered rebuttal testimony. For the reasons set forth below, we vacate the circuit court's order granting the Appellees' motions for directed verdict on the informed consent claim and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. *Facts*

In October 1985, O'Neal visited Dr. Hammer, an orthodontist, for treatment of jaw problems that she had been experiencing. After examining O'Neal, Dr. Hammer presented two alternative treatment plans to O'Neal. Plan # 1 was a combined treatment plan that would include orthodontics and or-

thodontic surgery to surgically advance O'Neal's lower jaw into a more forward position. It would require extraction of both of O'Neal's lower first bicuspids, realignment of her remaining teeth after the extractions, oral surgery to advance O'Neal's lower jaw, or mandible, to bring it into proper relationship with her upper jaw, and post-surgical orthodontic detailing to refine O'Neal's bite. Plan # 2 consisted of orthodontic treatment only, to establish the best possible interdigitation and alignment of O'Neal's teeth. Dr. Hammer explained to O'Neal the orthodontic risks of the two plans, as well as the *general* risks of surgery. He did not, however, inform O'Neal of the *specific* risks of mandibular advancement surgery.

Dr. Hammer recommended Plan # 1 because, in his opinion, the combined treatment suited O'Neal's particular problems. O'Neal followed Dr. Hammer's recommendation and opted for Plan # 1.

Before beginning treatment, Dr. Hammer referred O'Neal, a military dependant, to Tripler Army Medical Center (Tripler)'s oral maxillofacial surgery department, seeking its advice regarding whether or not O'Neal was a candidate for the surgical part of the treatment plan. After being told by Tripler's oral maxillofacial surgeons, Drs. Kraut and Blair, that O'Neal was a surgical candidate, Dr. Hammer initiated orthodontic treatment.

Two months prior to the extraction of her two lower bicuspids, O'Neal visited Dr. Williamson, another maxillofacial surgeon. At that time, Dr. Williamson was expected to perform the mandibular advancement surgery. O'Neal was concerned about the inability of the Tripler surgeons to guarantee a positive result. Dr. Williamson evidently did his own cephalometric analysis and concluded that O'Neal was a candidate for surgery. It is not clear whether, on this occasion, Dr. Williamson explained the risks or possible complications of mandibular advancement surgery to O'Neal.

As part of the combined treatment plan, O'Neal had her two lower first bicuspids extracted on May 28, 1986 by the Oral Surgery Department at Tripler. Prior to the extraction, O'Neal was warned of the risks of tooth extraction; she was not, however, warned of the risks of mandibular advancement surgery. Having chosen jaw advancement on Dr. Hammer's advice, once her bicuspids had been extracted, O'Neal had no choice but to go forward with the surgical treatment.

After the extraction wounds healed, O'Neal returned to Dr. Hammer and obtained new braces that would realign her teeth to fill the gaps. When these orthodontic adjustments were completed, Dr. Hammer told O'Neal that she was ready for the oral surgery. In December 1987, O'Neal told Dr. Hammer that she had scheduled the mandibular advancement surgery for December 17, 1989, with Dr. Berringer instead of Dr. Williamson.

Dr. Berringer did a bilateral sagittal split osteotomy of the mandible (the mandible advancement surgery) with direct fixation on O'Neal. Because the bone on the left side of O'Neal's jaw did not split properly, Dr. Berringer used a different procedure on the right side of her jaw.

O'Neal alleges that the surgery was performed negligently and that, as a result, she has to deal with several problems: she claims that, since the operation, her face looks "lopsided," that she has to endure severe neck, jaw, and shoulder pain, that her teeth no longer fit, that she is sometimes unable to chew, that she cannot open her mouth properly, and that she has undergone several unsuccessful surgical procedures in an attempt to repair the damage to her jaw.

### B. *Prior Proceedings*

On August 15, 1990, O'Neal filed a complaint against Drs. Hammer, Williamson, and Berringer, alleging that they failed to disclose the risks of surgery to her, that it was negligent for them to have advised her to have the surgery done, and that Dr. Berringer performed the surgery in a negligent manner. Before trial, Dr. Berringer settled with O'Neal, and the claims against him were dismissed with prejudice. On July 12, 1995, trial on O'Neal's remaining claims against Appellees commenced in the circuit court. After O'Neal rested, Appellees moved for directed verdicts. On July 24, 1995, the circuit court granted Appellees' motions for di-

rected verdict on the informed consent claim on the grounds that (1) although Dr. Hammer, an orthodontist, had a duty to disclose the orthodontic risks, because he was not an oral surgeon he had no duty to disclose risks associated with the surgical procedure to O'Neal; and (2) as a second opinion physician, Dr. Williamson had no duty to disclose surgical risks to O'Neal.

On July 25, 1995, after Appellees had rested their cases, O'Neal offered rebuttal testimony regarding the risks that Appellees had disclosed to her and the medical history that she had given to Appellees. The circuit court excluded O'Neal's proffered rebuttal testimony, ruling as follows: "The court has ruled on defendant's motion as to informed consent. The court has granted these motions. The focus with regards to risk is not so much on what was conveyed to the plaintiff, ... but what was in the mind of the defendant dental professionals with regards to how they weighed and considered the different factors with regards to whether or not Mrs. O'Neal should have those options presented to her so that she could make a choice. Your offered rebuttal is denied in the discretion of the court."

On July 26, 1995, the jury returned a special verdict on the professional negligence claim in favor of Appellees and against O'Neal. O'Neal timely filed this appeal.

On appeal, O'Neal argues that (1) the circuit court erred when it granted directed verdicts against her on her informed consent claims because she failed to establish a duty of disclosure through expert testimony, (2) the circuit court erroneously held that a dentist tendering a second opinion recommending surgery need not warn of the risks of the recommended surgery, (3) the circuit court erred in its holding that an orthodontist who recommends and participates in a combined treatment plan of orthodontics and surgery need not warn of the risks of surgery, (4) the circuit court erred when it granted the motions for directed verdict on O'Neal's claims for lack of informed consent, and (5) the circuit court abused its discretion when it barred O'Neal from testifying on rebuttal.[1]

## II.  STANDARD OF REVIEW

It is well settled that denials of directed verdict or judgment notwithstanding the verdict (JNOV) motions are reviewed *de novo*. Verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment.

*Takayama v. Kaiser Foundation Hosp.*, 82 Hawai'i 486, 495, 923 P.2d 903, 912 (1996) (citation and brackets omitted).

## III.  DISCUSSION

A.  *The circuit court erred to the extent that it held that expert testimony was necessary to establish that a dentist owes a duty to disclose the risks or potential complications of surgery.*

O'Neal first argues that the circuit court erred when it granted directed verdicts against O'Neal on her informed consent claims because she failed to prove by expert medical testimony that the Appellees departed from relevant medical standards. We are unable to *conclude* from the circuit court's ruling whether the court thought expert testimony was necessary to prove the existence of a duty to obtain informed consent. However, because the record suggests that the

---

1.  Because we vacate the circuit court's order granting Dr. Hammer's and Dr. Williamson's motions for directed verdict and remand this case for further proceedings, we need not address the issue whether the circuit court abused its discretion when it excluded O'Neal's proffered rebuttal testimony. Moreover, the resolution of this issue would not provide any additional guidance to the circuit court on remand because we recently resolved a similar claim in *Ditto v. McCurdy*, 86 Hawai'i 84, 947 P.2d 952 (1997).

circuit court did require expert testimony, this issue has to be considered.

In *Nishi v. Hartwell*, 52 Haw. 188, 473 P.2d 116 (1970), we stated that

> [i]n determining the question of a physician's liability for nondisclosure courts generally follow the rule applicable to medical malpractice actions predicated on alleged negligence in treatment which requires the question of negligence to be decided by reference to relevant medical standards and imposes on the plaintiff the burden of proving the applicable standard by expert medical testimony.

*Id.* at 195, 473 P.2d at 121 (citations omitted).

This in general was called the "physician-oriented" or "professional" standard of disclosure. In *Carr v. Strode*, 79 Hawai'i 475, 904 P.2d 489 (1995), the *Nishi* decision was partially overruled as far as the physician-oriented standard was concerned. Following *Canterbury v. Spence*, 464 F.2d 772, *reh'g denied*, 464 F.2d 772 (D.C.Cir.), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), and *Leyson v. Steuermann*, 5 Haw. App. 504, 705 P.2d 37 (1985), we expressly adopted the "patient-oriented" standard applicable to a physician's duty to disclose risk information prior to treatment. The patient-oriented standard means that

> expert testimony is not critical to demonstrate the amount of information a patient needs in order to intelligently decide between two treatment options. The decision as to what procedure to undergo is ultimately the patient's; to impose a standard of disclosure dictated by experts would be to undermine the decision-making power of patients in similar situations. Therefore, in proving the element of duty for informed consent purposes, a patient is not required to produce any expert medical testimony regarding what other reasonable dentists would have disclosed under the same or similar circumstances.

*Bernard v. Char*, 79 Hawai'i 371, 382, 903 P.2d 676, 687 (App.1995).

Thus, we hold that the circuit court erred to the extent that its ruling on the Appellees' directed verdicts were based on the misapprehension that O'Neal was required to prove a duty of disclosure by expert evidence.

**B.** *The circuit court erred when it ruled that an orthodontist recommending and participating in a combined treatment plan of orthodontics and surgery need not warn of the surgical risks.*

O'Neal next argues that the circuit court erred in concluding that a dentist who recommends and participates in a combined treatment plan of orthodontics and surgery, but does not perform the surgery, need not warn of the surgical risks.

The issue whether a physician who refers his patient to another physician for some special treatment and participates in a combined plan of treatment has a duty to disclose the risks connected with the special treatment has, until now, never been addressed in any Hawai'i cases. The issue, however, has been the subject of decisions from courts in several other jurisdictions, with varying results.

Most jurisdictions that have considered this issue have held that a referring physician does not have the duty to obtain a patient's informed consent. *See Logan v. Greenwich Hospital Ass'n*, 191 Conn. 282, 465 A.2d 294 (1983); *Davis v. St. Charles General Hosp.*, 598 So.2d 1244 (La.Ct.App. 1992); *Herrara v. Atlantic City Surgical Group*, 277 N.J.Super. 260, 649 A.2d 637 (Law Div.1994); *Shaw v. Kirschbaum*, 439 Pa.Super. 24, 653 A.2d 12 (1994); *Johnson v. Whitehurst*, 652 S.W.2d 441 (Tex.Ct.App. 1983).

■ Other jurisdictions, most notably in New York, look at the degree of control retained by the referring physician over the patient's treatment. Where the referring physician neither performs the procedure nor retains control over the patient's treatment, that physician does not have a duty to obtain informed consent. On the other hand, where a physician orders a specific procedure or otherwise retains control over the treatment of the patient, the physician is subject to a duty to obtain informed consent. *See Prooth v. Wallsh*, 105 Misc.2d 603, 432 N.Y.S.2d 663 (N.Y.Sup.Ct.1980); *Nisenholtz v. Mount Si-*

nai Hospital, 126 Misc.2d 658, 483 N.Y.S.2d 568 (N.Y.Sup.Ct.1984); *Kashkin v. Mount Sinai Medical Center,* 142 Misc.2d 863, 538 N.Y.S.2d 686 (N.Y.Sup.Ct.1989).

For example, in *Prooth v. Wallsh, supra,* the plaintiff sued his treating physician, the chief surgeon, the surgeon's assistant, and a private consulting cardiologist for injuries resulting from a surgical procedure based in part upon the theory of lack of informed consent. The Supreme Court, New York County, held that only the plaintiff's personal physician, who had retained a degree of participation in his treatment, and the chief surgeon, who operated on him, were obligated to obtain his informed consent to the procedure. 432 N.Y.S.2d at 663. With respect to the personal physician, the court noted that:

> [a] patient's personal physician bears the responsibility to assure the welfare of his patient in all phases of his treatment. Such treatment must, of necessity, include diagnosis and the prescription of a course of treatment by others, such as specialists.... [I]f [the treating physician] refers his patient to another physician and retains a degree of participation, by way of control, consultation or otherwise, his responsibility continues to properly advise his patient with respect to the treatment to be performed by the referred physician.

*Id.* Similarly, in *Kashkin, supra,* the plaintiff sued his treating physician, who referred him to another doctor for an endoscopic retrograde cholangiopancreatography, partly on the ground that the physician had failed to inform him of the risks of the invasive diagnostic procedure. Relying on *Prooth,* the New York County Supreme Court held that a physician who formally orders a procedure has a duty to obtain the patient's informed consent, even if the physician does not personally perform the procedure. *Id.* 538 N.Y.S.2d at 688.

However, in *Nisenholtz, supra,* a case similar to *Kashkin,* the New York County Supreme Court reached the opposite result, holding that

> it is clearly not necessary that every physician or health care provider who becomes involved with a patient obtain informed consent to every medical procedure to

which the patient submits. Rather, it is the responsibility of a physician to obtain informed consent to those procedures and treatments which the physician actually prescribes or performs.

*Id.* 483 N.Y.S.2d at 568. Therefore, the court concluded that a gastroenterologist who had treated the plaintiff for ten years prior to referring him to a surgeon was not obligated to obtain the plaintiff's informed consent to the surgical procedure. *Id.* at 573.

The apparently inconsistent results of *Nisenholtz* and *Kashkin* can be explained by the degree of participation and control retained by the referring physicians. In *Nisenholtz,* the referring doctor only proposed the further treatment. In *Kashkin,* the physician not only referred the plaintiff to another doctor for the specific procedure, but also scheduled the procedure and made the appropriate hospital arrangements. *Id.* 538 N.Y.S.2d at 688. Moreover, the plaintiff was referred to the other physician only after the decision to have the procedure had been made and the other doctor, whose role was merely to perform the procedure, did not meet the plaintiff until after she was admitted to the hospital. *Id.*

■ We are persuaded by the reasoning of the line of cases from New York State. While we agree with *Nisenholtz* that it is "not necessary that every physician or health worker who becomes involved with a patient obtain informed consent to every medical procedure to which the patient submits," 483 N.Y.S.2d at 572, especially considering the fact that, in most cases, the referring physician does not have the training or expertise to explain the inherent risks involved in the treatment or surgery that is to be performed by another physician, we also recognize that, in certain cases, as in *Prooth* and *Kashkin,* the degree of participation or the retention of control by the referring physician may obligate the physician to secure informed consent from his or her patient.

■ In the instant case, the mandibular advancement surgery was just one phase of Dr. Hammer's four-step treatment plan, which consisted of the extraction of O'Neal's

lower bicuspids, orthodontics to prepare her for the surgery, the surgery, and follow-up orthodontic treatment. Although Dr. Hammer was not qualified and never intended to perform the surgery himself, he coordinated all phases of the treatment. Dr. Hammer prepared the dental molds, took the photographs, ordered the x-rays, rendered the tracings, diagnosed O'Neal's jaw problem, and recommended orthodontics, extractions, and surgery. Dr. Hammer also scheduled the extractions, installed and adjusted the braces, and received half the fees. Most importantly, Dr. Hammer initiated the first irrevocable step in the treatment plan—the removal of O'Neal's bicuspids. Therefore, Dr. Hammer, like the physicians in *Kashkin* and *Prooth*, retained a degree of participation, by way of control, consultation and otherwise, that placed upon him a continuing responsibility to properly advise O'Neal of the risks and alternatives to the proposed surgery.

Accordingly, viewing the evidence in the light most favorable to O'Neal, we hold that the circuit court erred in granting Dr. Hammer's motion for directed verdict. As discussed, in certain cases, such as the case at hand, a referring doctor may be required to obtain an informed consent from his or her patient and it was therefore error for the circuit court to conclude, as a matter of law, that Dr. Hammer did not have the duty to obtain informed consent from O'Neal because Dr. Hammer did not perform the mandibular advancement surgery.

■ We note, however, that this duty may be discharged if another physician procures an informed consent from the patient prior to surgery, thereby breaking the chain of causation leading to the referring physician. *See Shkolnik v. Hospital For Joint Diseases*, 211 A.D.2d 347, 627 N.Y.S.2d 353, 355 (1995) (holding that plaintiff must prove that the referring doctor's failure to obtain informed consent was a legal cause of plaintiff's injury). In this case, in order to discharge this duty, the informed consent must have been obtained *prior to* the removal of the bicuspids and not before the mandibular advancement surgery because, as Dr. Hammer testified, O'Neal had little choice but to proceed with the surgery once the bicuspids had been removed. In other words, if a combined treatment plan is carried out in which one step depends on another and the patient is required to proceed with the remainder of the plan as soon as the first step is accomplished, it is not sufficient to inform the patient about the risk inherent in each individual step immediately prior to the performance of that step. Rather, to ensure the patient's right to intelligently and knowingly make his or her decision, all necessary information must be provided before the first irrevocable step in the treatment process is initiated. In the instant case, it is unclear from the record if the Tripler physicians, Dr. Williamson, or any other physician advised O'Neal of the risks of the proposed surgery before the removal of her bicuspids. As such, it cannot be determined whether, as a matter of law, Dr. Hammer's duty was discharged by the procurement of an informed consent by another physician. Accordingly, we vacate the circuit court's order granting a directed verdict in favor of Dr. Hammer and against O'Neal and remand for further proceedings to determine whether either (1) Dr. Hammer in fact advised O'Neal of the inherent risks of the proposed mandibular advancement surgery or (2) the Tripler physicians or Dr. Williamson obtained the informed consent prior to the removal of O'Neal's bicuspids, thereby discharging Dr. Hammer of his duty.

C. *The circuit court erred in concluding that a physician tendering a second opinion does not have a duty to warn of the risks of surgery.*

O'Neal next argues that the circuit court erroneously ruled that a dentist tendering a second opinion does not have a duty to warn of the risks of surgery.

■ This is a novel issue in Hawai'i. It is well established that the treating physician has a duty to obtain informed consent before proceeding with the treatment or surgery. *See Keomaka v. Zakaib*, 8 Haw.App. 518, 523, 811 P.2d 478, 482, *cert. denied*, 72 Haw. 618, 841 P.2d 1075 (1991). Likewise, we have settled in this case that a referring physician may, depending on the degree of partic-

ipation and control retained by the physician, also have a continuing obligation to warn of the risks and alternatives to a proposed treatment or surgery. *See supra* section III.B. This issue presents the question whether a consulting or "second opinion physician," who does not propose, coordinate, or perform the treatment or surgical procedure, has a similar duty to obtain informed consent from the patient. The answer to this question depends on whether the physician is a consulting physician or a physician rendering a second opinion.

"[T]he primary duty of a consulting physician is to advise and make recommendations to the treating physician himself who may, then, with full knowledge of the patient's history and other conditions, make the ultimate decision as to the scope of the information that should be given to the patient." *Prooth*, 432 N.Y.S.2d at 666. The second opinion physician, however, is called in directly by the patient to advise the patient, and not the referring doctor, about the proposed course of treatment or surgery. *See id.* (the court noted in dicta that "[c]onceivably, this rule [*i.e.,* that the consulting physician has no duty to obtain informed consent from the patient] might be otherwise if the consulting physician were called in directly by the patient for a second opinion, which is not the case at bar"). Therefore, the second opinion physician, unlike the consulting physician, owes a duty to the patient to inform the patient of the risks associated with the proposed treatment or surgical procedure. Indeed, an integral function of the second opinion physician is to advise the patient of the nature of the proposed treatment, its risks, and alternatives. It would be illogical to hold that the second opinion physician does not owe a duty to perform his or her primary duty—to advise of the risks and alternatives to the proposed treatment or surgery.

Citing *Halley v. Birbiglia*, 390 Mass. 540, 458 N.E.2d 710 (1983), Dr. Williamson argues that there was an insufficient physician-patient relationship between him and O'Neal to impose a duty on him to secure informed consent from O'Neal. In *Halley*, the Supreme Judicial Court of Massachusetts held there was an insufficient physician-patient relationship between a neurological consultant, who saw the patient intermittently prior to surgery and did not order or perform the procedure, and the patient to impose a duty on the neurological consultant to obtain informed consent. 458 N.E.2d at 716. We agree that, under the facts of *Halley*, the *consulting physician* did not have a duty to inform the patient of the risks of surgery. *Halley*, however, does not address the issue whether a *second opinion physician* owes a duty to obtain informed consent. We hold, for the reasons stated above, that there is a sufficiently close relationship between a physician and a patient, who is seeking a second opinion, to impose on the second opinion physician the duty to inform the patient of the risks and alternatives to the proposed treatment or surgery.

Accordingly, we hold that a consulting physician does not owe a duty to the patient to warn of the inherent risks of a proposed treatment or surgery. A physician tendering a second opinion, on the other hand, has an obligation to inform the patient of the nature of the proposed treatment or surgery, its risks, and alternatives. Because the record is unclear as to whether Dr. Williamson was a consulting physician or a physician rendering a second opinion, we vacate the circuit court's order granting Dr. Williamson's motion for a directed verdict and remand this case for a determination as to whether Dr. Williamson was a consulting doctor (in which case his duty was to advise and make recommendations to Dr. Hammer) or a second opinion physician (in which case his duty was to advise O'Neal of the risks associated with mandibular advancement surgery). If it is established that Dr. Williamson tendered a second opinion, then the circuit court should further determine if another physician in fact obtained O'Neal's informed consent before the removal of her bicuspids, thereby breaking the chain of causation leading to Dr. Williamson. *See supra* section III.B.

## IV. CONCLUSION

For the reasons discussed above, we vacate the circuit court's order granting the Appellees' motions for a directed verdict and

remand this case for further proceedings consistent with this opinion.