2003 ND 64

**Vee Ann KOAPKE, Plaintiff and Appellant,**

v.

**David A. HERFENDAL, DDS, Defendant and Appellee,**

and

**Gerard F. Koorbusch, DDS, MBA, Defendant.**

No. 20020177.

Supreme Court of North Dakota.

April 17, 2003.

William E. McKechnie, McKechnie Law Office, P.C., Grand Forks, for plaintiff and appellant.

Brenda L. Blazer, Vogel Law Firm, Bismarck, for defendant and appellee.

SANDSTROM, Justice.

[¶ 1] Vee Ann Koapke is appealing from a Northwest Judicial District Court summary judgment dismissing her malpractice claim against a Minot dentist, David Herfendal, for providing her a negligent treatment plan and failing to obtain proper informed consent. We affirm.

I

[¶ 2] Koapke visited Dr. Herfendal on September 3, 1998, for a cleaning and a checkup because of pain in some of her teeth. Prior to her appointment with Dr. Herfendal, Koapke's last visit to a dentist was in April 1994 when, as best as she can remember, she was diagnosed with gingivitis. Upon Koapke's arrival at Dr. Herfendal's office, her teeth were stained and yellowed from coffee and cigarettes. Koapke testified she generally brushed her teeth once a day and flossed approximately once a month.

[¶ 3]   Dr. Herfendal testified at his deposition that when Koapke arrived, she was very distraught and emotional and there were tears rolling down her face. Koapke discussed with Dr. Herfendal the pain she was experiencing and the embarrassment she felt about the condition of her mouth.   Dr. Herfendal examined Koapke's teeth and gums.   He testified he diagnosed Koapke with carious lesions and gave her two treatment options: full extraction of every tooth, or partial extraction, saving only one to three teeth around which partial dentures could be hooked. Koapke testified in her deposition that Dr. Herfendal informed her that her teeth were going to fall out in five years regardless, and explained to her only one option, which was a full-mouth extraction and dentures.   Koapke testified that Dr. Herfendal mentioned there were other options but told her the other options would be expensive, and he did not specifically explain any other option to her.

[¶ 4]   Dr. Herfendal testified in his deposition that based on his examination and their discussions about both Koapke's financial situation and what she wanted out of her teeth, Dr. Herfendal recommended Koapke proceed with a full-mouth extraction and dentures. Koapke testified at her deposition that Dr. Herfendal did not discuss his diagnosis with her nor did he discuss any of the risks of his recommended treatment plan.

[¶ 5]   Dr. Herfendal referred Koapke to an oral and maxillofacial surgeon, Dr. Gerald Koorbusch.   Dr. Herfendal retained a $750 deposit from Koapke for half of the cost of the final dentures he would fit for her after her surgery.   Dr. Herfendal and Dr. Koorbusch both testified at their depositions that they do not have, and never have had, an agency relationship or a partnership.

[¶ 6]   Upon Dr. Herfendal's referral, Koapke saw Dr. Koorbusch on September 29, 1998, for an initial evaluation.   At this initial visit, Dr. Koorbusch took her dental history and conducted a clinical examination of her teeth and gums.   He testified at his deposition that he informed Koapke she had options other than a full-mouth extraction but warned her the other options would be more expensive.

[¶ 7]   Dr. Koorbusch testified at his deposition that at Koapke's initial visit, she exhibited signs of pain and discomfort. He testified that his diagnosis after his clinical examination was Koapke "presented with both dental caries, tooth decay, and advanced periodontal disease throughout both dental arches, complete bony impactions of her upper right and lower left third molars and a soft tissue impacted lower right third molar, which was infected at the time of examination."   Dr. Koorbusch testified at his deposition that he talked to Koapke about his diagnosis.   He testified that his medical records reflect that after their discussion, Koapke was interested only in a full-mouth extraction rather than an alternative treatment.   He recommended she have a full-mouth extraction under intravenous sedation or local anesthesia because of her advanced periodontal disease and painful infection.

[¶ 8]   Koapke testified at her deposition she told Dr. Koorbusch that getting her teeth extracted and getting dentures was her preferred procedure and treatment plan.   Koapke admits Dr. Koorbusch did an examination; however, she argues he was relying on Dr. Herfendal's recommended treatment plan.   She further testified at her deposition that the significant amount of discussion with Dr. Koorbusch was spent only on the informed consent regarding the surgical procedure.   The surgery was performed on November 5, 1998.   Koapke returned to Dr. Koor-

busch's office for two follow-up visits with a different oral surgeon. On November 19, 1998, Koapke returned to Dr. Herfendal's office. Dr. Herfendal took the impression of Koapke's mouth to fit her dentures. Koapke testified at her deposition that Dr. Herfendal informed her that he would be unable to fit dentures for her bottom gums because of problems with her bone and that she should return to Dr. Koorbusch for implants. Koapke returned to Dr. Herfendal's office on November 24, 1998. Koapke testified at her deposition that during this visit she informed Dr. Herfendal she did not want to go to Dr. Koorbusch for implants, she asked for another referral, and she asked for her $750 deposit back. Dr. Herfendal referred her to another dentist and refunded her deposit. Koapke subsequently visited another oral surgeon for a second surgery to smooth out more of her bone and visited another dentist for dentures.

[¶ 9] On May 17, 2000, Koapke sued both Dr. Herfendal and Dr. Koorbusch. On September 4, 2001, Koapke dismissed Dr. Koorbusch on the merits, with prejudice, and without cost to either party. On February 28, 2002, Dr. Herfendal moved for summary judgment. Koapke presented expert testimony from retired professor Dr. Myer Leonard, who taught oral and maxillofacial surgery at the University of Minnesota and was head of oral and maxillofacial at Hennepin County Medical Center in Minneapolis for 25 years. Dr. Leonard testified at deposition that Dr. Herfendal's treatment of Koapke fell below the standard of care for a dentist. He testified that Dr. Herfendal should not have given Koapke a treatment plan, referred her to an oral surgeon, or accepted her $750 deposit, considering her emotionally distraught state of mind. He testified that in his opinion, Dr. Herfendal should have asked Koapke to come back a few days later when she was more calm and

then should have recommended she see a periodontist. He testified it was his opinion that Dr. Herfendal did not obtain Koapke's informed consent for the treatment plan of a full-mouth extraction and dentures. On May 20, 2002, the district court granted summary judgment in favor of Dr. Herfendal.

[¶ 10] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. This Court has jurisdiction under N.D. Const. art. VI, § 6, and N.D.C.C. § 28–27–01.

## II

[¶ 11] We review this appeal under our standard for summary judgment, a procedure allowing for prompt resolution of a controversy on the merits without a trial if the evidence demonstrates no dispute as to either a genuine issue of material fact or the inferences to be drawn from undisputed facts, and if the evidence shows a party is entitled to judgment as a matter of law. N.D.R.Civ.P. 56(c); *Bender v. Aviko USA L.L.C.*, 2002 ND 13, ¶ 4, 638 N.W.2d 545; *Fetch v. Quam*, 2001 ND 48, ¶ 8, 623 N.W.2d 357. "Even if a factual dispute exists, summary judgment is proper if the law is such that resolution of the factual dispute will not change the result." *Knight v. North Dakota State Industrial School*, 540 N.W.2d 387, 388 (N.D.1995). Whether a district court properly has granted summary judgment is a question of law, which we review de novo on the entire record. *Fetch*, at ¶ 8. The party seeking summary judgment bears the initial burden of showing there is no genuine dispute regarding the existence of a material fact. *Id.* at ¶ 9. On appeal, we view the evidence in the light most favorable to the party opposing the motion. *Id.* at ¶ 8. That party, however, must set forth specific facts, whether by affidavit or by directing the court to relevant evidence

in the record demonstrating a genuine issue for trial. N.D.R.Civ.P. 56(e). We explained in *Earnest v. Garcia*:

> Judges, whether trial or appellate, are not ferrets, obligated to engage in unassisted searches of the record for evidence to support a litigant's position. *Anderson v. A.P.I. Co. of Minnesota*, 1997 ND 6, ¶ 25, 559 N.W.2d 204. In *Umpleby By and Through Umpleby v. State*, 347 N.W.2d 156, 160 (N.D.1984), this Court explained:

> > A party resisting a motion for summary judgment has the responsibility of presenting competent admissible evidence by affidavit or other comparable means, and, if appropriate, drawing the court's attention to evidence in the record by setting out the page and line in depositions or other comparable documents containing testimony or evidence raising a material factual issue, or from which the court may draw an inference creating a material factual issue.

> > In summary judgment proceedings the trial court has no legal obligation or judicial duty to search the record for evidence opposing the motion for summary judgment. This principle is equally applicable, if not more so, to appellate proceedings because the appellate court, except for jurisdictional matters and the taking of judicial notice, generally considers only those issues raised in the trial court.

[Citations omitted]. The party opposing the summary judgment motion "must also explain the connection between the factual assertions and the legal theories in the case, and cannot leave to the court the chore of divining what facts are relevant or why facts are relevant, let alone material, to the claim for relief." *Peter-son v. Zerr*, 477 N.W.2d 230, 234 (N.D. 1991).

1999 ND 196, ¶ 10, 601 N.W.2d 260.

[¶ 12] On appeal, Koapke argues Dr. Koorbusch did not do an independent exam but relied on Dr. Herfendal's treatment plan, and Dr. Herfendal's treatment plan was not only negligent in its design but was also devised without Koapke's informed consent. Koapke testifies, in her deposition, her injury is that her dentures were ill-fitted, and had she known this could happen, she would not have gone through with the full-mouth extraction plan.

[¶ 13] Other jurisdictions that have considered a dentist's duty to his patients have held a dentist owes the same duty to a patient as a physician owes to a patient. *Donathan v. McConnell*, 121 Mont. 230, 193 P.2d 819, 825 (1948); *O'Neal v. Hammer*, 87 Hawai'i 183, 953 P.2d 561, 565 (1998); *LeBeuf v. Atkins*, 28 Wash.App. 50, 621 P.2d 787 (1980); *Petterson v. Lynch*, 59 Misc.2d 469, 299 N.Y.S.2d 244, 245 (1969). We conclude the law on physicians' duties to their patients also applies to dentists, and the law on a physician's duty to obtain informed consent from a patient in North Dakota will likewise apply to a dentist.

[¶ 14] The doctrine of informed consent is essentially the duty of a physician to disclose sufficient information to permit a patient to make an informed and intelligent decision on whether to submit to a proposed course of treatment or surgical procedure. *Jaskoviak v. Gruver*, 2002 ND 1, ¶ 13, 638 N.W.2d 1. If a physician fails to obtain a patient's informed consent, the physician may be held negligent. *Id.* "A plaintiff in an informed-consent case must establish breach of a physician's duty of disclosure, causation, and injury." *Id.* A plaintiff must show the

existence of a material risk that the physician failed to disclose, as well as causation and an injury. *Id.* Along with establishing nondisclosure of required information, causation, and actual damage resulting from the undisclosed risk, a plaintiff must also show that "reasonable persons, if properly informed, would have rejected the proposed treatment." *Id.* (citing 1 Dan B. Dobbs, *The Law of Torts* § 250 (2001)). " 'A causal connection exists only when adequate disclosure would have caused the patient to withhold consent to the particular course of treatment or procedure.' " *Id.* (quoting *Buzzell v. Libi,* 340 N.W.2d 36, 40 (N.D.1983)).

[¶ 15] For proper informed consent, a physician must disclose the diagnosis, the nature of the contemplated procedure, the material risks involved, the probability of success, and the existence and risks of any alternatives. *Id.* at ¶ 17. Determining whether a risk is material requires "(1) 'an examination of the existence and nature of the risk and the probability of its occurrence'; and (2) 'a determination by the trier of fact of whether the risk is the type of harm which a reasonable patient would consider in deciding on medical treatment.' " *Id.* at ¶ 18 (quoting *Guidry v. Neu,* 708 So.2d 740, 744 (La.Ct.App. 1997)). A physician need not disclose all possible risks and dangers of a proposed procedure, but must disclose those that are serious and likely to occur. *Id.* There is no need to disclose risks that are remote or of little consequence or so inherent in the treatment, they are common knowledge. *Id.*

[¶ 16] The duty of a referring physician to obtain informed consent generally arises only if there is an agency relationship between the referring physician and the surgeon or if there is negligence in the referral, or, in some jurisdictions, if there is some retention of control over the surgery or course of treatment. *Stovall v. Harms,* 214 Kan. 835, 840, 522 P.2d 353, 356–57 (1974); *Graddy v. New York Medical College,* 19 A.D.2d 426, 428–29, 243 N.Y.S.2d 940, 943 (1963).

[¶ 17] The majority of jurisdictions considering this issue have held a referring physician does not have the duty to obtain a patient's informed consent. *See Hopkins v. Mills–Kluttz,* 77 S.W.3d 624 (Mo. Ct.App.2002); *Estate of Tranor v. Bloomsburg Hosp.,* 60 F.Supp.2d 412, 414 (1999); *Logan v. Greenwich Hospital Ass'n,* 191 Conn. 282, 465 A.2d 294, 306 (1983); *Davis v. St. Charles General Hosp.,* 598 So.2d 1244, 1246 (La.Ct.App.1992); *Herrara v. Atlantic City Surgical Group,* 277 N.J.Super. 260, 649 A.2d 637, 640 (1994); *Shaw v. Kirschbaum,* 439 Pa.Super. 24, 653 A.2d 12, 15 (1994); *Johnson v. Whitehurst,* 652 S.W.2d 441, 445 (Tex.Ct.App.1983).

[¶ 18] These jurisdictions hold that it clearly is not necessary for every physician or health care provider who becomes involved with a patient to obtain informed consent for every medical procedure to which the patient submits. Rather, it is the responsibility of a physician to obtain informed consent for those procedures and treatments that the physician formally prescribes or performs. *Logan,* 465 A.2d at 306 (referring physician had no obligation to inform patient of alternative procedures); *Stovall,* 522 P.2d at 359 (in the absence of unusual circumstances, a general practitioner who referred a patient to a psychiatric specialist had no duty to advise patient of risks and dangers incident to psychiatric treatment); *Davis,* 598 So.2d at 1246 (only the medical professional actually performing the procedure, not the referring physician, must provide informed consent); *Herrara,* 649 A.2d at 641 (treating physician, not referring physician, had duty to explain options and risks involved in course of treatment); *Shaw,* 653 A.2d at

17 (referring physician has no duty to provide information to patient to aid patient in giving informed consent to surgeon); *Johnson*, 652 S.W.2d at 445 (a physician who did not participate in surgery had no duty to inform of possible risks and complications); *Halley v. Birbiglia*, 390 Mass. 540, 458 N.E.2d 710 (1983) (a referring physician who examined the patient and recommended a test but did not formally order the test was not held liable for injury caused by the test).

[¶ 19]  Other jurisdictions, such as New York and Hawaii, look at whether there is some degree of control retained by the referring physician over the patient's treatment.

> Where the referring physician neither performs the procedure nor retains control over the patient's treatment, that physician does not have a duty to obtain informed consent.  On the other hand, where a physician orders a specific procedure or otherwise retains control over the treatment of the patient, the physician is subject to a duty to obtain informed consent.

*O'Neal v. Hammer*, 87 Hawai'i 183, 953 P.2d 561, 565 (1998) (citing *Prooth v. Wallsh*, 105 Misc.2d 603, 432 N.Y.S.2d 663 (N.Y.Sup.Ct.1980); *Nisenholtz v. Mount Sinai Hospital*, 126 Misc.2d 658, 483 N.Y.S.2d 568 (N.Y.Sup.Ct.1984); *Kashkin v. Mount Sinai Medical Center*, 142 Misc.2d 863, 538 N.Y.S.2d 686 (N.Y.Sup. Ct.1989)).

[¶ 20]  In *O'Neal*, the Hawaii Supreme Court was faced with the issue of whether a dentist who recommends and participates in a treatment plan of orthodontics and surgery, but does not perform the surgery, should warn of the surgical risks. *O'Neal v. Hammer*, 87 Hawai'i 183, 953 P.2d 561 (1998).  The Hawaii Supreme Court held that to find the referring dentist owed a duty to obtain informed con-

sent from a patient, the dentist must have had some degree of control over the surgical procedure or the patient's treatment plan. *Id.* at 566.  In *O'Neal*, the dentist coordinated all phases of the treatment. *Id.* He prepared the dental molds, took the photographs, ordered the x-rays, rendered the tracings, diagnosed O'Neal's jaw problem, and recommended orthodontics, extractions, and surgery. *Id.* at 567.  He also scheduled the extractions, installed and adjusted the braces, and received half the fees. *Id.* Most important, the dentist removed O'Neal's bicuspids, which was the first irrevocable step in the treatment plan. *Id.* The Hawaii Supreme Court held the dentist in this case had a continuing responsibility to properly advise his patient of the risks and alternatives to the proposed surgery. *Id.*

[¶ 21]  In the jurisdictions that consider the degree of control retained by the referring physician over the patient's treatment, the amount of control is the determinative factor. *Id.* at 566.  In these jurisdictions, less control is found when the referring physician does not have the training or expertise to explain the inherent risks involved in the treatment or surgery to be performed by a specialist. *Id.* In some cases, however, a slight degree of participation or the retention of some control may obligate the referring physician to obtain informed consent. *Id.* at 566; *Prooth v. Wallsh*, 105 Misc.2d 603, 432 N.Y.S.2d 663 (N.Y.Sup. Ct.1980); *Kashkin v. Mount Sinai Medical Center*, 142 Misc.2d 863, 538 N.Y.S.2d 686 (N.Y.Sup.Ct.1989) (the referring doctor owed a duty to his patient to obtain informed consent when the physician not only referred the patient but also scheduled the procedure and made hospital arrangements).

[¶ 22]  Some jurisdictions have held a referring physician's duty may be dis-

charged if the chain of causation is broken and another physician procures an informed consent from the patient prior to surgery. *O'Neal,* 953 P.2d at 567 (citing *Shkolnik v. Hospital for Joint Diseases,* 211 A.D.2d 347, 627 N.Y.S.2d 353, 355 (N.Y.App.Div.1995)).

[¶ 23] We agree with the majority of jurisdictions that for liability to arise, the referring physician must do more than retain "a degree of participation." The referring physician can be held liable only when that physician has formally ordered a procedure or actually participated in the treatment or procedure. Here, Dr. Herfendal neither formally ordered nor performed the surgery; therefore, as a matter of law, he was under no duty to obtain Koapke's informed consent.

[¶ 24] In this case, Dr. Herfendal saw Koapke for a cleaning and checkup. Upon completing a routine examination, he gave her a recommended treatment plan based on the condition of her teeth and the amount of pain she was experiencing. He then referred her to a specialist surgeon, Dr. Koorbusch. Dr. Herfendal did retain a deposit from Koapke for $750 to go toward the fitting of her dentures, but subsequently refunded the money upon Koapke's request to have another dentist fit her dentures. Koapke's expert witness, Dr. Leonard, testified that in his opinion Dr. Herfendal should have recommended a referral to a periodontist instead of to an oral surgeon for a full-mouth extraction and, because of Koapke's distraught state of mind, he should not have asked for a deposit. In her deposition, Koapke stated that when she arrived at Dr. Herfendal's office, she was not crying or shaking or in extreme pain. Dr. Leonard also stated it was his opinion that Dr. Herfendal did not obtain Koapke's informed consent for the treatment plan of full-mouth extraction and dentures. Whether Dr. Herfendal was required to obtain Koapke's informed consent for the treatment plan or surgery is a matter of law and not of fact. Dr. Herfendal was merely a referring physician, and, as such, we conclude Koapke does not have a claim against him.

[¶ 25] Dr. Koorbusch, the oral surgeon, conducted an initial examination and subsequently performed the surgery. In this case, Dr. Koorbusch is the only physician who owed Koapke the duty to obtain her informed consent on the treatment plan and the procedures of surgery. Koapke's case turns on whether Dr. Koorbusch disclosed the diagnosis, the nature of the contemplated procedure, the material risks involved, the probability of success, and the existence and risks of any alternatives. Having dismissed Dr. Koorbusch, Koapke has thus dismissed the physician required to obtain her informed consent.

[¶ 26] Koapke also argues Dr. Herfendal was negligent in his formulation of the treatment plan and, if he is not solely responsible for Koapke's harm, the law requires apportionment in deciding what share of fault and damages he may owe. Because we have concluded that Koapke does not have a claim against Dr. Herfendal, we need not decide this issue.

### III

[¶ 27] The summary judgment of the district court is affirmed.

[¶ 28] GERALD W. VANDE WALLE, C.J., JOHN C. McCLINTOCK, JR., District Judge, concur.

[¶ 29] The Honorable JOHN C. McCLINTOCK, JR., District Judge, sitting in place of KAPSNER, J., disqualified.

MARING, Justice, dissenting.

[¶ 30]  We have not had previous occasion to consider whether a physician who develops a treatment plan for a patient, which includes a referral for specific surgery and a return for completion of the treatment plan, owes a duty of informed consent to that patient.

[¶ 31]  As the majority points out, a number of jurisdictions have concluded that a referring physician, who does not have an agency relationship with the surgeon; who does not participate in the surgery or treatment; or who does not retain any control over the treatment, does not have a duty to obtain a patient's informed consent.  I agree that to generally impose such a duty on a referring physician who practices general medicine would impose an "intolerable burden."  *Herrara v. Atlantic City Surgical Group,* 277 N.J.Super. 260, 649 A.2d 637, 640–41 (Law Div.1994) (quoting *Stovall v. Harms,* 214 Kan. 835, 522 P.2d 353, 359 (1974)).  I am of the opinion, however, that where the facts indicate the referring physician has recommended a specific procedure, has the training to explain the results and options, and has retained control over the patient's treatment, the physician is subject to a duty to obtain informed consent.  *See O'Neal v. Hammer,* 87 Hawai'i 183, 953 P.2d 561, 565 (1998) ("[W]here a physician orders a specific procedure or otherwise retains control over the treatment of the patient, the physician is subject to a duty to obtain informed consent."); *see also Kashkin v. Mount Sinai Medical Center,* 142 Misc.2d 863, 538 N.Y.S.2d 686 (N.Y.Sup.Ct.1989).

[¶ 32]  The affidavits and depositions submitted in this case in support of the response to Dr. Herfendal's motion for summary judgment reveal facts from which a fact-finder could infer retention of control by Dr. Herfendal over the treatment of the patient, Koapke.

[¶ 33]  Koapke claims she went to Dr. Herfendal to have her teeth cleaned.  He advised her that based on the condition of her teeth she should have all of her teeth pulled and dentures fabricated.  His diagnosis of her was "severe periodontitis, dental caries and pericoronitis on lower right third molar."  Koapke states that Dr. Herfendal did tell her she could have a partial extraction and partial dentures, but that in five years she would end up pulling all her teeth anyway.  She then would need full-mouth dentures, and this would be more expensive.  Dr. Herfendal does not dispute that this is what he told Koapke on September 3, 1998.  He also does not dispute the decision was made at that appointment that Koapke would have all of her teeth pulled and would return to him for the fabrication and fitting of her dentures.  The cost was discussed, and Koapke paid Dr. Herfendal one-half or $750 for the dentures.  Dr. Herfendal states in his answers to interrogatories, "I referred Ms. Koapke to Dr. Koorbusch for evaluation and extractions.  Ms. Koapke planned to return for denture fabrication. . . .  On 9/29/98, my office finalized referral of Ms. Koapke to Dr. Koorbusch at Face & Jaw."

[¶ 34]  Koapke saw Dr. Koorbusch on September 29, 1998.  Dr. Koorbusch states in his answers to interrogatories that Dr. Herfendal referred Koapke to him for an "evaluation and eventual removal of all remaining teeth in preparation for full upper and lower dentures."  Dr. Koorbusch states he discussed with Koapke the "complications of surgery including but not limited to damage to the lower jaw nerve or persistent opening into the sinus as a result of tooth removal."  He states she was not interested in restoration of any teeth, but rather desired their removal and replacement with dentures.  Koapke dis-

putes that Dr. Koorbusch discussed treatment options with her and states that he relied on Dr. Herfendal to have discussed "options" with her.

[¶ 35] On November 5, 1998, Koapke had full-mouth dental extraction. On November 6, 1998, Koapke was seen by Dr. Shannon of the Face & Jaw Surgery Center for follow up. On November 12, 1998, she was again seen by Dr. Shannon for follow up and found to be progressing in a satisfactory manner so she was referred back to Dr. Herfendal for "denture construction."

[¶ 36] On November 19, 1998, she saw Dr. Herfendal and he took impressions to begin fabrication. He then told her that she did not have enough bone on the bottom and very little in the back top. Koapke states Dr. Herfendal told her she would need implants or her dentures would not stay in. Koapke states that if she had been told this was a possibility, she would not have made a decision to pull all of her teeth.

[¶ 37] On November 24, 1998, Dr. Herfendal decided to refer Koapke to Dr. McMahon because he was concerned he could not meet her expectations. He refunded her $750.

[¶ 38] Koapke claims Dr. Herfendal never told her that because of her advanced periodontal disease, she may suffer bone loss with a full-mouth extraction to an extent her dentures would be difficult to secure and she may require implants. Dr. Herfendal states he did not recall discussing with Koapke some of the common problems with dentures. He states he did not discuss the possibility of implants with her. Koapke states Dr. Koorbusch did not discuss these risks with her either.

[¶ 39] Dr. Herfendal is a dentist. He has training and knowledge to fit and fabricate dentures. He developed a treatment plan which included a full-mouth dental extraction by Dr. Koorbusch and then the fitting of upper and lower dentures by him. He received half of the cost of the dentures before referring Koapke to Dr. Koorbusch. Dr. Herfendal's office made the referral to Dr. Koorbusch. Dr. Koorbusch states that Dr. Herfendal referred Koapke "to me for evaluation and eventual removal of all remaining teeth in preparation for full upper and lower dentures." Dr. Koorbusch examined her oral cavity, reviewed panoramic radiographs, and arranged for the surgical removal of all her remaining teeth. He explained to Koapke he would remove all of her teeth and the possible complications of surgery. After the full-mouth extraction, he referred her back to Dr. Herfendal for the fitting and fabrication of her dentures.

[¶ 40] A fact-finder could draw the inference that Dr. Herfendal was knowledgeable and had the training to fit and fabricate dentures; that he knew of the risk of bone loss and possibility of the need for implants; that he developed a treatment plan, which was to fit and fabricate full upper and lower dentures for Koapke; that the extraction of the teeth by Dr. Koorbusch was one step in the treatment plan; and that the referral was only to complete that step with the final step being the return to Dr. Herfendal for the fitting and fabrication of the dentures. Viewing the evidence in the light most favorable to Koapke, which we must do on a motion for summary judgment, a fact-finder could find that Dr. Herfendal is a qualified physician, who had control over the course of treatment of Koapke, who exposed her to the risk and must explain that risk. I would reverse and remand this case for further proceedings.

[¶ 41] Finally, I also agree with the Hawaii and New York courts that "this duty may be discharged if another physi-

cian procures an informed consent from the patient prior to surgery, thereby breaking the chain of causation leading to the referring physician." *O'Neal,* 953 P.2d at 567; *Shkolnik v. Hospital For Joint Diseases Orthopaedic Inst.,* 211 A.D.2d 347, 627 N.Y.S.2d 353, 355 (N.Y.App.Div. 1995). Accordingly, the fact-finder must determine whether Dr. Koorbusch advised Koapke of the inherent risks of full-mouth extraction in light of her advanced periodontal disease and plan to wear dentures.

[¶ 42] I would reverse and remand because I believe there are genuine issues of material fact whether Dr. Herfendal retained control of the treatment of Koapke and owed a duty to obtain informed consent from her.

[¶ 43] WILLIAM A. NEUMANN, J., concurs.